**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| GOLDEN HOUR DATA SYSTEMS, INC., a California corporation, | |
| Plaintiff, | CIVIL ACTION NO.  2:06-cv-381-TJW |
| v. | |
| EMSCHARTS, INC., a Pennsylvania corporation, and SOFTTECH, LLC, an Oregon limited liability company, | Judge T. John Ward |
| Defendants. | |
| AND RELATED COUNTERCLAIMS | |

## PLAINTIFF GOLDEN HOUR DATA SYSTEMS, INC.'S

## OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

Page #s

I.   INTRODUCTION ..................................................................................................1

II.  GOLDEN HOUR AND THE ASSERTED '073 PATENT ................................1

    A.   Background Of Golden Hour ......................................................................1

    B.   The '073 Patent..........................................................................................2

    C.   The Asserted Claims..................................................................................2

III. THE LAW OF CLAIM CONSTRUCTION .....................................................3

    A.   Claim Terms Are Presumed To Have Their Ordinary
        Meaning .....................................................................................................4

    B.   The Presumption Of Favoring Ordinary Meaning Is
        Overcome In Only Limited Circumstances ................................................6

IV.  GOLDEN HOUR'S CONSTRUCTION OF DISPUTED CLAIM
    TERMS SHOULD BE ADOPTED BY THE COURT ....................................7

    A.   Golden Hour's Proposed Construction Of Claim Terms In
        Claim 1 And Associated Dependent Claims 6, 7, And 8 ........................8

        1.   Claim 1: "capable of dispatching"..................................................8

        2.   Claim 1: "transportation tracking information"...........................9

        3.   Claim 1: "recorded"......................................................................10

        4.   Claim 1: "appropriately" ..............................................................10

        5.   Claim 6: "instructions for dispatching" ......................................11

        6.   Claim 7: "instructions for tracking" ............................................11

    B.   Golden Hour's Proposed Construction Of Claim Terms In
        Claim 10 And Associated Dependent Claims 12, 13, And
        14 ...............................................................................................................12

        1.   Claim 10: "capable of interpreting data" ....................................12

        2.   Claim 10: "determining a diagnosis".............................................12

        3.   Claim 10: "appropriately" ............................................................13

        4.   Claim 12: "instructions for displaying".........................................13

**TABLE OF CONTENTS**
(Cont'd.)

**Page #s**

5.  Claim 12: "diagnoses" ............................................................. 13

6.  Claim 14: "instructions for marking" ...................................... 13

7.  Claim 14: "sentinel event" ....................................................... 14

C.  Golden Hour's Proposed Construction Of Claim Terms In
Claim 15 And Associated Dependent Claims 16, 17, 18, 19,
20, 21, And 22 ................................................................................ 15

1.  Claim 15: "collecting flight information" ............................... 15

2.  Claim 15: "collecting patient information" ............................. 15

3.  Claim 15: "produce an encounter record" .............................. 15

4.  Claim 16: "patient encounter record" ..................................... 16

5.  Claim 21: "marking sentinel events" ....................................... 16

V.  THE PROPOSED CLAIM CONSTRUCTIONS OF
EMSCHARTS SHOULD BE REJECTED ................................................... 16

A.  The Proposed Constructions Of emsCharts Attempt To Add
Unsupported Limitations And Redundancies Into The
Asserted Claims ............................................................................. 16

B.  Specific Objections To emsChart's Proposed Claim
Constructions .................................................................................. 17

VI.  CONCLUSION ............................................................................................. 28

## TABLE OF AUTHORITIES

**Page #s**

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.,*
        73 F.3d 1573 (Fed. Cir. 1996) .............................................................5

*British Telecomms. PLC v. Prodigy Communications Corp.,*
        189 F. Supp. 2d 101 (S.D.N.Y. 2002) ...............................................3

*CCS Fitness, Inc. v. Brunswick Corp.,*
        288 F.3d 1359 (Fed. Cir. 2002) ......................................................5, 6

*Cybor Corp. v. FAS Technologies, Inc.,*
        138 F.3d 1448 (Fed. Cir. 1998) ..........................................................3

*Gart v. Logitech, Inc.,*
        254 F.3d 1334 (Fed. Cir. 2001) ..........................................................3

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.,*
        887 F.2d 1050 (Fed. Cir. 1989) .......................................................3-4

*Inverness Med. Switz. GmbH v. Warner Lambert Co.,*
        309 F.3d 1373 (Fed. Cir. 2002) ..........................................................5

*K-2 Corp. v. Salomon S.A.,*
        191 F.3d 1356 (Fed. Cir. 1999) ......................................................3, 4

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
        358 F.3d 898 (Fed. Cir. 2004) .............................................25, 26, 27

*Markman v. Westview Instruments, Inc.,*
        52 F.3d 967 (Fed. Cir. 1995) ..............................................................3

*Omega Eng'g, Inc. v. Raytek Corp.,*
        334 F.3d 1314 (Fed. Cir. 2003) ..........................................................7

*Personalized Media Communications, LLC v. Int'l Trade Comm'n,*
        161 F.3d 696 (Fed. Cir. 1998) ....................................................passim

*Phillips v. AWH Corp.,*
        415 F.3d 1303 (Fed. Cir. 2005), *cert. denied,* 546 U.S. 1170,
        126 S. Ct. 1332 (2006)...........................................................4, 5, 6, 7

*Quantum Corp. v. Rodime, PLC,*
        65 F.3d 1577 (Fed. Cir. 1995) ............................................................4

*Seachange Int'l, Inc. v. C-COR Inc.,*
        413 F.3d 1361 (Fed. Cir. 2005) ..........................................................7

## TABLE OF AUTHORITIES
### (Cont'd.)

Page #s

*SRI Int'l v. Matsushita Elec. Corp.*,
  775 F.2d 1107 (Fed. Cir. 1985) .......................................................................................6

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ..................................................................................4, 6

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ......................................................................................3

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) .......................................................................................5

## OTHER AUTHORITIES

35 U.S.C. § 112 ................................................................................................................passim

# I. **INTRODUCTION**

In this lawsuit Golden Hour Data Systems, Inc. ("Golden Hour") asserts that emsCharts, Inc. and Softtech, LLC infringe United States Patent No. 6,117,073 ("the '073 patent"), entitled "Integrated Emergency Medical Transportation Database System," and assigned to Golden Hour. The parties have exchanged initial proposed claim constructions, conferred and have filed a Joint Claim Construction Chart reflecting each party's proposal for the disputed constructions as provided by P.R. 4-4 of Rules of Practice for Patent Cases before the Eastern District of Texas. This Memorandum is presented in support of Golden Hour's proposed claim constructions that are set forth in the Joint Claim Construction Chart and discussed in further detail below.

As the Court will see, Golden Hour believes that many of the terms for which emsCharts seeks the Court's construction require no construction at all, and those terms should generally be accorded their ordinary and customary meaning as understood in the context of the '073 patent specification. This is because the asserted claims are generally written in plain English with little or no technical jargon, and the inventors only rarely acted as their own "lexicographers" in providing specific definitions for terms recited in the asserted claims. Hence, the normal legal presumption of no required court construction generally applies in this case.

For its part, most of emsCharts' proposed constructions attempt to add limitations to the claims that simply are not there (as patent defendants are generally wont to do for obvious reasons). Most of these tortured constructions are based on an attempt to add limitations plucked out of the patent specification from a particular disclosed or preferred embodiment of the invention in contravention of long-standing Federal Circuit precedent. The constructions proposed by emsCharts are also confusing, rather than clarifying. In many cases if emsCharts' proposed construction were inserted into the claim it would render the claim redundant and/or incomprehensible and of no assistance to the jury.

## II. **GOLDEN HOUR AND THE ASSERTED '073 PATENT**

### A. **Background Of Golden Hour**

Golden Hour provides software systems and related services that integrate flight dispatch, flight following for air transport, clinical patient charting, and billing functions for the medical

air transport industry. "The Golden Hour" from which plaintiff takes its name refers to the hour immediately following a serious injury and is generally considered the most critical period in the victim's survival and recovery. Golden Hour's systems and services help air (and ground) medical transport companies maximize their revenue through a patented integrated approach to patient data collection, information and medical charting management, billing, and collections for flight and medical services rendered. Golden Hour's systems were originally developed by two emergency physicians and resulted in the granting of U.S. Patent No. 6,117,073 that is being asserted in this lawsuit ("the '073 patent"). Exhibit A.[1]  Golden Hour is headquartered in San Diego, California, but has customers in the medical air transport industry throughout the United States.

**B.**  **The '073 Patent**

The patent application which ultimately issued as the '073 patent was filed on March 3, 1998 in the United States Patent and Trademark Office (the "PTO"). During prosecution, the first and only Office Action was issued on February 18, 1999. The Office Action rejected some of the claims, but Claims 15-22 were allowed as originally filed. In response to the Office Action, the Applicant filed an Amendment on August 18, 1999 which amended some of the rejected claims and presented arguments distinguishing the rejected claims over the cited references. A copy of Applicant's Amendment is attached hereto as Exhibit B. In view of the claim amendments and arguments presented, the Examiner allowed the claims. The '073 patent issued on September 12, 2000, with 27 claims.

**C.**  **The Asserted Claims**

In this lawsuit Golden Hour is asserting independent Claims 1, 10 and 15, and their respective dependent Claims 6-8, 12-14, and 16-22. Claims 1 and 10 (and their respective dependent Claims 6-8 and 12-14) are apparatus claims. Claim 15 (and its dependent Claims 16-22) are method claims.

---

[1] Unless otherwise noted all exhibits referenced herein are attached to the Declaration of Frederick Berretta filed concurrently herewith.

## III. <u>THE LAW OF CLAIM CONSTRUCTION</u>

Claim construction is a question of law for the court to decide. *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1455-56 (Fed. Cir. 1998); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). The goal of construing patent claims is not to rewrite the claims, but to explain to the trier of fact, where necessary, how the terms chosen by the patentee would have been understood by one of ordinary skill in the art. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1365 (Fed. Cir. 1999). Where the proper meaning of particular claim terms is understandable to the jury without explanation, no claim construction is necessary and none should be given. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court."); *British Telecomms. PLC v. Prodigy Communications Corp.*, 189 F. Supp. 2d 101, 119 (S.D.N.Y. 2002) (unnecessary to define every claim term). If fact, the Federal Circuit has emphasized that where the proper meaning of a claim term is understandable to the jury without explanation, no claim construction is necessary and none should be given:

> The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy.

*United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *see also British Telecomms. PLC v. Prodigy Communications Corp.*, 189 F. Supp. 2d 101, 119 (S.D.N.Y. 2002) (declining to construe claim language because "[i]t is not a technical term; the simple English words contained in the phrase need no particular defining, and it can be understood without recourse to any other material").

Where a construction is necessary, "[t]he construction of claims is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001). "[C]ourts cannot alter what the patentee has chosen to claim as his invention." *Intervet Am., Inc.*

*v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed. Cir. 1989); *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995) ("[I]t is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims.").

## A.    Claim Terms Are Presumed To Have Their Ordinary Meaning

Claim construction begins by considering the words of the claim. *See K-2 Corp.*, 191 F.3d at 1364-65; *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170, 126 S. Ct. 1332 (2006) ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention [in the specification] will be, in the end, the correct construction."). Federal Circuit has frequently held that the words of a claim "are generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312. This case presents no exception to that general rule. In fact, there is a "heavy presumption 'that a claim term carries its ordinary and customary meaning.'" *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This ordinary and customary meaning "is the meaning that the [claim] term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313.

The "ordinary and customary meaning" of a claim term is the meaning the term would have to a person of ordinary skill in the art at the time of the invention. *Id.* at 1313. The person of ordinary skill in the art is deemed to understand the claim term in the context of the entire patent, including the specification. *Id.* Thus, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. As will be shown below, this is generally such a case. However, if the meaning of a claim term is not immediately apparent, courts may also consult "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Id.* Those "sources" include:

1) the words of the claims themselves;

2) the patent specification;

3) the prosecution history, and if necessary; and

4) extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

*Id.*

"[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Courts may also consider the patent's prosecution history, which consists of the record of the proceedings before the PTO. *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Id.* Like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent.

> Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.

*Id.*; *see also Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002) (the ambiguity of the prosecution history made it less relevant to claim construction); *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (the ambiguity of the prosecution history made it "unhelpful as an interpretive resource" for claim construction).

If the ordinary meaning is not readily ascertainable based upon a review of the intrinsic evidence, then extrinsic evidence may be consulted, which consists of "all evidence external to the patent and prosecution history." *Id.* at 1317. For instance, dictionary definitions may establish the ordinary meaning of a claim term. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *Phillips*, 415 F.3d at 1322 ("Dictionaries or comparable sources are

often useful to assist in understanding the commonly understood meaning of words and have been used both by our court and the Supreme Court in claim interpretation. . . .   A dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation.'" (citations omitted)).   In many cases, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges" such that "claim construction . . . involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.

**B.**     **The Presumption Of Favoring Ordinary Meaning Is Overcome In Only Limited Circumstances**

The presumption favoring the ordinary meaning of claim terms will be overcome only in the following four specific circumstances:

(1) Where the patentee acted as his or her own "lexicographer" by expressly redefining a claim term in either the specification or prosecution history. *CCS Fitness*, 288 F.3d at 1366.

(2) Where the specification or prosecution history show that the inventor has disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope. *See Teleflex*, 299 F.3d at 1324.

(3) Where the term chosen by the patentee has no ordinary meaning and so "deprive[s] the claim of clarity" as to require resort to the other intrinsic evidence for a definite meaning. *CCS Fitness*, 299 F.3d at 1367.

(4) Where a claim limitation is written as a "means" for performing a function in conforming with 35 U.S.C. § 112 ¶ 6. *CCS Fitness*, 299 F.3d at 1367.

A party cannot overcome the heavy presumption of ordinary meaning in an effort to narrow claim terms "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *Id.* at 1366.   Therefore, claims are normally broader than the embodiments in the specification. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 n.14 (Fed. Cir. 1985) (*en banc*).

In sum, the Federal Circuit "indulge[s] a heavy presumption that claim terms carry their full ordinary and customary meaning, unless the patentee unequivocally imparted a novel

meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003) (internal citation omitted). However, the doctrine of prosecution disclaimer does not apply "where the alleged disavowal is ambiguous;" the disavowal must "be both clear and unmistakable" to one of ordinary skill in the art. *Id.* at 1326; *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1373 (Fed. Cir. 2005) ("A disclaimer must be clear and unambiguous.").

Finally, if all other sources of relevant information fail, Courts may also consider extrinsic evidence, such as technical dictionaries, to determine the meaning specialized claim terms would have to one of skill in the art. *Phillips*, 415 F.3d at 1318. However, extrinsic evidence is generally less reliable than the patent specification and prosecution history in determining the meaning of claim language. *Id.*

## IV.  GOLDEN HOUR'S CONSTRUCTION OF DISPUTED CLAIM TERMS SHOULD BE ADOPTED BY THE COURT

Golden Hour's asserted claims generally are directed to computerized systems and methods for tracking patient incidents. As will be shown below, emsCharts proposes many claim constructions that improperly attempt to read many new limitations into the claims. For the most part, the terms proposed by emsCharts do not need construction by the Court because they generally do not use technical terminology or jargon and should be accorded their ordinary and customary meaning.[2] There are, however, some limited instances where construction by the Court would be helpful to the jury -- terms for which Golden Hour has specifically called for the Court's construction as provided below.[3]

---

[2] In order to assist the Court in determining the ordinary and customary meaning of certain claim terms, copies of certain general purpose and medical dictionary definitions referenced by Golden Hour herein are submitted herewith as Exhibits C and D, respectively.

[3] In some cases, terms and/or phrases are recited in multiple claims below. To the extent that a term and/or phrase appears in a particular independent claim, Golden Hour contends that it should be similarly construed with respect to any dependent claim in which it appears.

**A.**    **Golden Hour's Proposed Construction Of Claim Terms In Claim 1 And Associated**

**Dependent Claims 6, 7, And 8**

Although there are many claim terms or phrases that are in dispute, most of the "disputed terms" require no construction at all.  Many of the terms addressed herein are disputed only because emsCharts improperly seeks to rewrite them to limit the claims to the preferred embodiment described in the '073 patent.

In the following sections, Golden Hour applies the claim construction methodology mandated by the Federal Circuit to terms it believes require construction by the Court.  In each instance, Golden Hour advances interpretations that are based upon ordinary and customary meaning of the terms that are consistent with the intrinsic evidence.  In contrast, emsCharts asks the Court to construe various terms in the claims which include common English language words that are properly understood to have their ordinary and customary meaning.  The ordinary and customary meaning of these words does not embrace the additional details from preferred embodiments in the specification and file history that emsCharts seeks to import into the claims.

**1.**    **Claim 1: "capable of dispatching"**

The phrase "capable of dispatching" is easily understood as "able to issue an order to deploy to a destination."  Nowhere in the patent specification or file history did the patentee redefine this phrase.  The *American Heritage College Dictionary* (3rd Edition 1993) defines "dispatch" to mean "to relegate to a specific destination or send on specific business."  Ex. C at 400.  Golden Hour's proposed definition is consistent with this definition, especially when viewed in light of the '073 patent specification.

For example, the '073 patent specification describes that a "dispatch center might deploy a helicopter 24, airplane 25, or ambulance 26."  Ex. A at 4:55-57.[4]  The specification further describes that "[t]he dispatch module on the server computer 12 can be accessed via an interface to a dispatch computer 20, which might reside, for example, at the dispatch center that receives

---

[4] Citations herein to Golden Hour's Exhibit A (the '073 patent) are presented with the column number preceding a colon, and line numbers presented after the colon.  Thus, the citation Ex A. at 5:3-25 should be understood to be referencing the '073 patent at column 5, lines 3-25.

the initial call to deploy an emergency medical team." Ex. A. at 4:44-51. Thus, the specification describes in general terms that the dispatch module is used to deploy various types of emergency vehicles to destinations.

Further additional details are provided about a specific embodiment of a dispatch module in connection with Figure 4 of the '073 patent. From that discussion, it is clear that the specification is not describing a dispatch module which controls the operation of the vehicles, but rather that the dispatch module issues orders which result in the deployment of the emergency transport vehicles. For example, the specification makes reference to a "dispatch order" which is used to dispatch a crew to a location such as an incident scene or hospital. *See* Ex. A at 11:51-62. Thus, while an overly literal interpretation of the phrase "capable of dispatching" could be understood to mean that the dispatch module actually controls the movement of the vehicles themselves, in context, it is clear that the "dispatching" in the claim is referring to issuing a dispatch order.

2. **Claim 1: "transportation tracking information"**

Claim 1 also recites the feature of "transportation tracking information." When viewed in the context of the '073 patent specification, this phrase is readily understood to mean "information about the movement of the emergency transport crew," an understanding which is in accordance with the ordinary and customary meaning of the words in the phrase when considered in the context of the '073 patent.

In one exemplary embodiment described in the '073 patent specification, the patentee describes a system that records information related to the movements of the patient transport crew. Although a number of different metrics are described as being tracked in the system, these measurements are merely examples of information that may be tracked, and are aptly summarized by the patentee's statement that the dispatch module "records information pertinent to the flight proper." Ex. A at 6:44-45. As discussed in detail below, emsCharts has proposed a definition for this phrase which attempts to improperly read the specific disclosed embodiments into the claim. There is no indication in the patent specification or file history that the patentee intended the narrow meaning proposed by emsCharts. Rather, it is clear from the specification

-9-

and file history that one of ordinary skill in the art would understand that term to be generally referring to the movements of the crew.

Moreover, dictionary definitions for "transportation tracking information" are consistent with Golden Hour's proposed definition. The *American Heritage College Dictionary* defines "tracking" to mean "to observe or monitor the course of (aircraft, for example), as by radar." Ex. C at 1432-1433. The process described in the '073 patent specification is consistent with Golden Hour's proposed construction and also with this dictionary meaning because the patient transport crew travels on an aircraft, the movements of which are tracked by the system. Therefore, to the extent that the Court deems it necessary to construe the phrase "transportation tracking information" it should be defined to mean "information about the movement of the emergency transport crew."

### 3.   Claim 1: "recorded"

The term "recorded" is easily understood in the context of the patent specification to mean "automatically stored." In describing the operation of the dispatch module, the '073 patentee states that "[t]he flight module … records information pertinent to the flight proper." Ex. A at 6:43-45. The patentee further explains that mileage traveled, *inter alia*, is "recorded automatically" by the dispatch module. Ex. A at 6:57-60. Further, the description in the specification related to Figures 4B and 4C, clearly indicates that this is an automated process. *See* Ex. A at 12:13-44. Accordingly, the term "recorded" should be construed to mean "automatically stored."

### 4.   Claim 1: "appropriately"

The term "appropriately," to the extent that it needs construction, should be construed by the Court to mean "accurately." emsCharts alleges that the term is indefinite and incapable of being construed. Although Golden Hour believes that the term "appropriately" is a common everyday word that requires no elaboration, in order to demonstrate to the Court that the term is capable of construction, Golden Hour proposes the definition stated above. In the '073 patent specification, the patentee describes a need for a system capable of "accurately billing the patient for services rendered." Col. 2, lines 2-3. Further, the detailed description of the billing system

discloses the use of numerous consistency checks to ensure that the patient is billed accurately for the services rendered. *See* Ex. A at 18:45 to 20:59. Accordingly, to the extent that the Court deems it necessary to construe the term "appropriately," it should be given its ordinary and customary meaning in light of the claims and specification, which is "accurately."

**5.   Claim 6: "instructions for dispatching"**

Claim 6 recites the phrase "instructions for dispatching." Consistent with the proposed definition for "capable of dispatching" as discussed above, this phrase should be construed by the Court to mean "computer software for issuing an order to deploy to a destination." The term "instructions" should be construed to mean "computer software" because the teachings of the '073 patent specification make clear that the dispatch module is computer software that may exist on a server, a dispatch computer, or both. *See* Ex. A at 4:47-57.

**6.   Claim 7: "instructions for tracking"**

The phrase "instructions for tracking" [the flight path of a helicopter] is readily understood in the context of the patent specification to mean "computer software for automatically storing positions on" [the flight path of a helicopter]. As noted above, the *American Heritage College Dictionary* defines "tracking" to mean "to observe or monitor the course of (aircraft, for example), as by radar." An example of a dispatch process is provided in the specification of the '073 patent with reference to Figure 4. There, the patentee states that the dispatch process "begins flight tracking." *See* Ex. A at 12:13-24. The specification further states that "[f]light tracking and other transportation information 126 is processed within the flight submodule." Ex A. at 10:35-37. Viewed in the broader context of a "computerized integrated data management system," it is clear that the flight tracking process described in connection with Figure 4 is an automatic process in which position coordinates are received into the system via an automated flight following process.

**B.**  **Golden Hour's Proposed Construction Of Claim Terms In Claim 10 And Associated Dependent Claims 12, 13, And 14**

**1.**  **Claim 10: "capable of interpreting data"**

Claim 10 recites the phrase "capable of interpreting data." This phrase is readily understood to mean "able to process diagnostic information." The '073 patent specification describes a physical exam process in which a clinician conducts a physical examination on a patient and inputs findings related to the patient's condition. *See, e.g.*, Ex. A at 14:22-35; Figs. 6, 7 ("the results of a neurological exam on the patient are received by the medical database system"). The clinical module is able to process this input information to generate additional information, such as whether the condition or finding is a diagnosis. *Id.* ("determination is then made at a decision state 404 whether the findings from the neurological exam are themselves a diagnosis"). Thus, viewed in the context of the specification, it is clear that the phrase "capable of interpreting data" simply refers to the clinical module's ability to process information received as part of the patient examination process. As discussed in detail below, emsCharts attempts to improperly import an artificial intelligence component into the phrase "interpreting data."

**2.**  **Claim 10: "determining a diagnosis"**

The phrase "determining a diagnosis," to the extent that it needs construction by the Court, is easily understood to mean "generating information about a medical finding, condition, or disease" which is in accordance with its ordinary and customary meaning. For example, *Dorland's Illustrated Medical Dictionary* defines diagnosis as "the determination of the nature of a case of disease." Ex. D at 490. *Dorland's* further defines a "clinical diagnosis" as a "diagnosis based on signs, symptoms, and laboratory findings during life." *Id.* None of the four exceptions to interpreting the claim according to the ordinary and customary meaning are applicable in this instance. The patentee did not act as his own lexicographer with respect to this phrase, nor was there any disavowal or disclaimer of claim scope made during prosecution. Moreover, as shown by the definition provided above, the phase "determining a diagnosis" has an easily ascertainable and readily understandable meaning to those in the art.

emsCharts' proposed definition seeks to read an artificial intelligence aspect into the claim which is simply not present in any embodiment discussed in the specification.   emsCharts' contention is based on a tortured interpretation of one very specific embodiment disclosed in the '073 specification.   However, a party cannot overcome the heavy presumption of ordinary meaning in an effort to narrow claim terms "simply by pointing to the preferred embodiment or other structures or steps disclosed in the specification or prosecution history." *Fitness*, 288 F.3d at 1366.

### 3. Claim 10: "appropriately"

The term "appropriately" in Claim 10 should be construed in the same manner as it is construed with respect to Claim 1 as discussed above ("accurately").

### 4. Claim 12: "instructions for displaying"

Consistent with the proposed definitions for "instructions" described above in connection with Claims 6 and 7, the phrase "instructions for displaying" is properly understood to mean "computer software for generating to a visual output device."   The word "instructions" is properly understood to mean "computer software" as would be readily understood by a skilled artisan in light of the patent disclosure which describes various embodiments of the invention as being implemented by computer software.   The term "displaying" is properly understood to mean "generating to a visual output device."   Figure 1 of the '073 patent shows a clinical and diagnosis computer 30 that includes a visual output for communicating information to a user.

### 5. Claim 12: "diagnoses"

Consistent with the proposed definition for "determining a diagnosis" as discussed above in connection with Claim 10, the term "diagnoses" (which is the plural form of diagnosis) is properly understood to mean "medical findings, conditions, or diseases." *Dorland's Illustrated Medical Dictionary,* Ex. D at 490.

### 6. Claim 14: "instructions for marking"

The phase "instructions for marking" is properly understood to mean "computer software for identifying."   The '073 patent specification describes when viewed in light of the ordinary and customary meaning of the terms which are consistent with embodiments described in the

specification.  The phrase "marking" is not specifically used in the '073 patent specification. The specification does, however, teach that patient records are "flagged to indicate that sentinel events occurred during the treatment period." Ex. A at 18:41-42.  It is clear from this context that "marking" means that records are identified in a way that makes it easier to find them for later review or attention.  Further support for Golden Hour's proposed construction is found in dictionary definitions for the word "mark." For example, the *American Heritage College Dictionary* defines "mark" to mean "to single out or indicate as if by a mark."  This definition is consistent with both the '073 patent specification and Golden Hour's proposed definition. Because it is supported by both the intrinsic evidence and is consistent with the ordinary and customer meaning of the term "mark," Golden Hour's proposed definition for "instructions for marking" should be adopted by the Court.

    **7.**    **Claim 14: "sentinel event"**

Based on the patentee's specific definitions of the term "sentinel event" as provided in the specification, this term is properly understood to mean "any action during a patient encounter that might require further review, or a major happening that might require notification to a third party, or an event that is worthy of special attention."  The patentee has acted as his own lexicographer with respect to the term "sentinel event" in four specific instances in the '073 patent specification.  The patentee states that "[a] sentinel event is any action during the encounter that might require a further review." Ex. A at 3:48-53.  The patentee further states that "a sentinel event is a major happening at the accident side which might require notification to a hospital" or to "a third party." Ex. A at 12:45-52; 17:30-31.  The patentee also states that "sentinel events can be events that happen during the patient encounter that are worthy of special attention." Ex. A at 19:62-64.  Thus, the definition for "sentinel event" is a broad definition that includes many things.  In view of the patentee's clear choice to act as his own lexicographer and broadly define what may be considered a "sentinel event," Golden Hour's proposed construction for the phrase should be adopted by the Court.

**C.**     **Golden Hour's Proposed Construction Of Claim Terms In Claim 15 And Associated Dependent Claims 16, 17, 18, 19, 20, 21, And 22**

**1.     Claim 15: "collecting flight information"**

The phrase "collecting flight information" is properly understood to mean "automatically or manually gathering and automatically storing information about a flight." The '073 patent specification describes a flight information collection process as including the automatic collection of certain information (such as flight path information), and also describes a manual entry of other information about a flight (time of departure and flight crew personnel, for example). *See, e.g.*, Ex. A at 6:11-67. Thus, in light of the specification, one of skill in the art would understand that the collecting of flight data could include both manual entry and automatically entered data. The specification further indicates that the data received into the flight module is then automatically stored when it is "saved after verification as a dispatch record." Ex. A at 7:4-5.

**2.     Claim 15: "collecting patient information"**

The phrase "collecting patient information" is properly understood to mean "automatically or manually gathering and automatically storing information about a patient." The '073 patent specification describes a patient information collection process that includes manual entry of certain data (such as results from the physical exam process) and also includes the automatic entry of other data (such as readings from external equipment). *See, e.g.*, Ex. A at 9:14-16, 13:11-16. In light of the specification describing both automatic input and manual input of patient information, a skilled artisan would understand that the collection of patient data could include both manual data entry and automatic data entry. As a result, this phrase is properly construed to mean "automatically or manually gathering and automatically storing information about a patient."

**3.     Claim 15: "produce an encounter record"**

The phrase "produce an encounter record" is properly understood to mean "create an electronically accessible collection of information." The '073 patent specification teaches that the information gathered in the course of a patient is encounter is used to create a patient chart.

Ex. A at 3:21-23.   The specification further teaches that the "chart is then electronically generated from the compendium of the information entered in a standardized fashion...." Ex A at 3:39-43.  The '073 patent specification further discloses that the chart is made electronically accessible so that "[c]ustomized and research reports can also be provided rapidly."  In light of this description in the specification, one of skill in the art would understand that "produce an encounter record" means that an electronically accessible collection of information is created by the system which is indicative of a patient's clinical encounter.

### 4.   Claim 16: "patient encounter record"

The term "patient encounter record" in Claim 16 should be accorded the same meaning as "encounter record" as it is defined with respect to Claim 15.  For the reasons stated immediately above, the term "patient encounter record" should be defined by the Court to mean "an electronically accessible collection of information about a patient encounter."

### 5.   Claim 21: "marking sentinel events"

Consistent with the definitions discussed above for "instructions for marking" and "sentinel events," the term "marking sentinel events" should be construed by the Court to mean "identifying any action during a patient encounter that might require further review, or a major happening that might require notification to a third party, or an event that is worthy of special attention."

## V.  THE PROPOSED CLAIM CONSTRUCTIONS OF EMSCHARTS SHOULD BE REJECTED

### A.   The Proposed Constructions Of emsCharts Attempt To Add Unsupported Limitations And Redundancies Into The Asserted Claims

The numerous (28) proposed claim constructions of Defendant emsCharts all generally suffer from the same problem -- they attempt to read many new limitations into the claims. Often these additional proposed limitations are not even found in the preferred embodiments of the invention disclosed in the '073 patent.  Rather, in many cases they appear to lack any intrinsic support whatsoever and simply introduce new undefined terms into the claims.  Also, in

-16-

many cases if emsCharts' proposed construction were inserted into the claim it would render the claim redundant and/or incomprehensible and of no assistance to the jury.

**B.**     **Specific Objections To emsChart's Proposed Claim Constructions**

**1.     emsCharts proposes that "integrated data management" in the preambles of Claims 1 and 10 means "uses a common format with a common language and a common server for all modules and functions."**

emsCharts cites col. 1, ln 49 to col. 2, ln 3; col. 11, lns 9-26 of the '073 patent specification (Ex. A) and the Amendment (Ex. B) at pgs. 3-5 filed during the prosecution of the patent as intrinsic support for its construction. However, none of these citations provides support for limiting the claimed "integrated data management system" to one using common formats, a common language, and a common server for all modules and functions. Col. 1, ln 49 to col. 2, ln 3 is merely part of the "Background of the Invention" and has no requirements regarding commonality of formats, languages and/or servers. Col. 11, lns 9-26 of the '073 patent merely describes an example of data flow between modules, such as ICD-9 codes being sent from the clinical to the billing module, or flight information being retrieved into the billing module. This disclosure is also silent regarding commonality of formats, languages and/or servers.

The Amendment filed on August 18, 1999 also does not support the added limitations proposed by emsCharts. This Amendment led to the allowance of Claims 1 and 10, but the preamble of each claim where the term "integrated data management" is used was not amended. *See* Ex. B. The Examiner had originally rejected Claims 1-14 and 23-27 in view of the Sloane reference. The Amendment primarily distinguishes the amended claims over Sloane, but does not impose any new claim limitations regarding commonality of formats, languages and/or servers used. Nor is there any disclaimer of an "integrated data management system" that lacks common formats, common language and a common server for all modules and functions. *Id.*

Moreover, emsCharts' proposed construction cannot be substituted into the existing Claims 1 and 10 without rendering the claims incomprehensible. This construction would only confuse, rather than assist, the jury. In sum, there is no intrinsic support for emsCharts' proposed construction of "integrated data management" found in the preambles of Claims 1 and 10, and it would only confuse the jury.

2.    **emsCharts proposes that "patient incident" in Claims 1, 10 and 15 means "events associated with a person requiring medical treatment."**

emsCharts cites col. 2, lns 15-42; col. 3, lns 44-47; and col. 7, lns 34-58 as intrinsic support for its construction. However, this term requires no construction because the claims in which it is used already contain the language "patient incident requiring emergency medical care by [the][an] emergency transport crew." *See* Claims 1, 10 and 15.   emsCharts proposed construction is therefore redundant and would only confuse the jury if substituted into the claims. The term "patient incident" as used in the claims is already clear and well-defined by the claims themselves, so needs no further construction.

3.    **emsCharts proposes that "a first module capable of dispatching" used in Claim 1 means "software in a common server portion that sends off specific individuals to a specific location, having integrated submodules of schedule, standby, flight and transfer." emsCharts also proposes that this is a "means plus function" claim term that must be construed under 35 U.S.C. § 112, para. 6.**

emsCharts cites col. 4, ln 47-66; col. 6, ln 11 to col. 7, ln 9 as intrinsic support for its construction. However, the specification clearly provides that the software may reside in both a server and dispatch computer. Col. 4, lns 51-54. There is also no requirement of "specific individuals" being sent off, as the claim already states that an "emergency transport crew" is being dispatched. The proposed construction is therefore redundant. The patent's disclosure of various sub-modules is merely a description of a preferred embodiment, and not a requirement of Claim 1. Also, emsCharts proposed construction cannot be substituted into the existing Claim 1 without rendering the claim incomprehensible. This construction would only confuse, rather than assist, the jury.

There is also no support for construing this limitation under 35 U.S.C. § 112, para. 6. The claim does not use the word "means," and the structure for performing the function, a software module in a "computerized system," is included in the claim. *See Personalized Media Communications, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703-4 (Fed. Cir. 1998). (the absence of 'means' creates a rebuttable presumption that section 112 paragraph 6 does not apply). This is just another attempt to improperly read limitations of the preferred embodiments into the claim. *See also* Ex. C at 207 (defining "capable").

-18-

4.     emsCharts proposes that "<u>transportation tracking information</u>" used in Claim 1 means "timed and recorded vehicle position checks from the dispatch location to the incident location and to the final disposition location."

emsCharts cites col. 11, lns 36-45; col. 12, lns 13-23 as intrinsic support for its construction.  However, col. 11, lns 36-45 merely discusses the transportation base, and col. 12, lns 13-23 merely describes certain conditions when flight tracking would be used.  Although disclosed as a preferred embodiment, these citations do not require that "<u>transportation tracking information</u>" include "timed and recorded vehicle position checks."  Col. 6, lns 45-46.  Also, there is no claim requirement that position checks be done throughout the entire flight from dispatch through final disposition location.  While that may be preferred, the claim merely requires that some information about the movement of the emergency transport crew be recorded.  *See also* Ex. C at 1432-33, 1438 (defining "track" and "transportation").

5.     emsCharts proposes that "<u>a second module capable of receiving</u>" used in Claim 1 means "software in a common server portion that receives patient incident information and transportation tracking information in a common language from a first module."  emsCharts also proposes that this is a "means plus function" claim term that must be construed under 35 U.S.C. § 112, para. 6.

emsCharts cites col. 3, lns 44-47; col. 5, lns 7-19; col. 18, ln 45 to col. 20, ln 49 as intrinsic support for its construction.  However, the specification clearly provides that the software may reside in either the billing computer or the server.  See Ex A at 5:10-13.  Also, none of these citations requires a "common server" or "common language."  The proposed construction is also redundant and cannot be substituted into the existing Claim 1 without rendering the claim incomprehensible.  This construction would only confuse, rather than assist, the jury.  *See also* Ex. C at 207, 1139 (defining "capable" and "receiving").

There is also no support for construing this limitation under 35 U.S.C. § 112, para. 6. The claim does not use the word "means," and the structure for performing the function, a software module in a "computerized system," is included in the claim.  *See Personalized Media Communications,* 161 F.3d at 703-4 (the absence of 'means' creates a rebuttable presumption that section 112 paragraph 6 does not apply).  This is just another attempt to improperly read limitations of the preferred embodiments into the claim.

6.      emsCharts proposes that "<u>billing the patient appropriately</u>" used in Claim 1 means "preparing and sending reports and bills to hospitals, patients and medical centers, and tracking payments until full payment has been received for the bill." emsCharts also contends that the term "appropriately" cannot be construed because it is indefinite.

emsCharts cites col. 3, lns 54-62; col. 18, ln 45 to col. 20, ln 49 as intrinsic support for its construction.   However, none of these citations requires limitations that "reports" be sent anywhere, or that bills be sent to "hospitals" and "medical centers."   The citations describe a preferred embodiment of a billing system that includes reports and the like, but the claim only requires that a **patient** be appropriately (i.e., "accurately") billed.   *See also* Ex. C at 67, 137 defining "appropriate" and "bill").   The claim also does not require that payments be tracked until full payment is received.   That again is merely an optional preferred aspect of the invention.

7.      emsCharts proposes that "<u>transportation costs</u>" used in Claim 1 means "vehicle costs and treatment costs associated with the patient incident."

emsCharts cites col. 18, ln 63 to col. 19, ln 5; col. 11, lns 9-26; Amendment pgs 3-4 as intrinsic support for its construction.   However, these citations do not support the notion that "transportation costs" includes "treatment costs."   For example, the specification distinguishes between a treatment description and flight information, although both may be retrieved into the billing module.   *See* Ex. A at 11:10-20; *see also* Ex. C at 1438 (defining "transportation").   The Amendment also does not support this construction.   In it the patentee merely distinguished the amended claims over the Sloane reference as to billing for actual as opposed to virtual services rendered.   *See* Ex. B.

8.      emsCharts proposes that "<u>tracking the flight path of</u>" used in Claim 7 means "timed and recorded position checks in accordance with Federal Aviation Agency and Commission on Accreditation of Medical Transportation requirements."

emsCharts cites col. 6, lns 43-48 as intrinsic support for its construction.   Golden Hour does not necessarily dispute this claim construction provided that it is understood in the context of a "**computerized**" system.   The claim requires "**instructions** for tracking" and therefore refers to computer software for automatically storing positions on the flight path of the helicopter.   *See* discussion re Golden Hour's proposed constructions, *supra*.

9.   emsCharts proposes that "<u>a first module capable of interpreting</u>" used in Claim 10 means "software in a common server portion independently evaluating." emsCharts also proposes that this is a "means plus function" claim term that must be construed under 35 U.S.C. § 112, para. 6.

emsCharts cites col. 2, lns 15-24; col. 3, lns 44-47 as intrinsic support for its construction. However, these citations do not support adding a limitation about a "common server portion" or an "independent" evaluation of data.  Nor does emsCharts define these new proposed terms. This construction would only confuse, rather than assist, the jury.

There is also no support for construing this limitation under 35 U.S.C. § 112, para. 6. The claim does not use the word "means," and the structure for performing the function, a software module in a "computerized system," is included in the claim.  *See Personalized Media Communications,* 161 F.3d at 703-4.  This is just another attempt to improperly read limitations of the preferred embodiments into the claim.

10.   emsCharts proposes that "<u>interpreting data</u>" used in Claim 10 means "independently evaluating data."

emsCharts cites col. 2, lns 15-24; col. 13, ln 61 to col. 14, ln 5 as intrinsic support for its construction.  However, these citations do not support adding a limitation about "independent" evaluation of data, and it is unclear what is meant by this proposed new claim term.  This proposal is also redundant of the previous proposed construction and would only confuse, rather than assist, the jury.

11.   emsCharts proposes that "<u>determining a diagnosis</u>" used in Claim 10 means "software independently correlating results from patient exams to a specific defined patient medical condition without human intervention."

emsCharts cites col. 13, ln 35 to col. 14, ln 20 as intrinsic support for its construction. However, these citations do not discuss "independently correlating results" or "a specific defined patient medical condition," and emsCharts does not explain what these proposed new terms mean in the context of the '073 patent.  Also, emsCharts is proposing a definition which is a noun (i.e., software), while the claim term is a gerund.  The proposed construction cannot be substituted into the existing Claim 10 without rendering it incomprehensible and would only confuse, rather than assist, the jury.  *See also* Ex. D at 490 (defining "diagnosis").

12.    emsCharts proposes that "physical findings" used in Claim 10 means "results of specific physical exam processes."

emsCharts cites col. 2, lns 34-42; col. 7, ln 56 to col. 8, ln 16 as intrinsic support for its construction.  However, these citations do not limit the physical findings to results of specific physical exam processes.  Such specific processes are merely provided as a "default" in the preferred embodiment.  See Ex. A at 7:57-59.  This claim term needs no construction.

13.    emsCharts proposes that "physical examination" used in Claim 10 means "process of obtaining specific patient's medical measurable characteristics."

emsCharts cites col. 7, ln 56 to col. 8, ln 16 as intrinsic support for its construction. However, this citation does not explain what is meant be a "specific patient's medical measurable characteristics," and emsCharts offers no definition that would aid the jury.  This claim term also needs no construction.

14.    emsCharts proposes that "a second module capable of receiving" used in Claim 10 means "software in a common server portion that receives patient incident information in a common language from said first module." emsCharts also proposes that this is a "means plus function" claim term that must be construed under 35 U.S.C. § 112, para. 6.

emsCharts cites col. 3, lns 44-47; col. 18, ln 45 to col. 20, ln 49 as intrinsic support for its construction.  However, the specification clearly provides that the software may reside in either the billing computer or the server.  Col. 5, lns 10-13.  Also, none of these citations requires a "common server" or "common language."  The proposed construction is also redundant and cannot be substituted into the existing Claim 1 without rendering the claim incomprehensible. This construction would only confuse, rather than assist, the jury.  *See also* Ex. C at 207, 1139 (defining "capable" and "receiving").

There is also no support for construing this limitation under 35 U.S.C. § 112, para. 6. The claim does not use the word "means," and the structure for performing the function, a software module in a "computerized system," is included in the claim.  *See Personalized Media Communications,* 161 F.3d at 703-4.  This is just another attempt to improperly read limitations of the preferred embodiments into the claim.

15.     emsCharts proposes that "receiving information" used in Claim 10 means "collecting information, including physical findings and diagnoses and storing same on a common server."

emsCharts cites col. 3, lns 44-47; col. 14, ln 21 to col. 16, ln 49 as intrinsic support for its construction. However, these citations do not support a limitation that both physical findings and diagnoses be stored on a common server. This proposal is also redundant of the previous proposed construction and would only confuse, rather than assist, the jury. This claim term also needs no construction.

16.     emsCharts proposes that "billing the patient appropriately" used in Claim 10 means "preparing and sending reports and bills to hospitals, insurance companies, patients and medical centers, and tracking payments until full payment has been received for the bill." emsCharts also contends that the term "appropriately" cannot be construed because it is indefinite.

emsCharts cites col. 1, ln 66 to col. 2, ln 3; col. 5, lns 16-19; col. 11, lns 9-26; col. 18, ln 45 to col. 20, ln 49 as intrinsic support for its construction. However, none of these citations requires limitations that "reports" be sent anywhere, or that bills be sent to "hospitals," "insurance companies" and "medical centers." The citations describe a preferred embodiment of a billing system, but the claim only requires that a **patient** be appropriately (i.e., "accurately") billed. *See also* Ex. C at 67, 137 (defining "appropriate" and "bill"). The claim also does not require that payments be tracked until full payment is received. That again is merely an optional preferred aspect of the invention.

17.     emsCharts proposes that "first module includes instructions for displaying" used in Claim 12 means "software in a common server portion which generates a visual list of ranked diagnoses based on physical findings." emsCharts also proposes that this is a "means plus function" claim term that must be construed under 35 U.S.C. § 112, para. 6.

emsCharts cites col. 3, lns 44-47; col. 15, ln 63 to col. 16, ln 49 as intrinsic support for its construction. However, the specification clearly provides that the clinical software may reside in a server or in a portable computer. See, e.g., Ex. A. at 4:66 to 5:3. There is also no claim requirement that the displayed diagnoses be "ranked." Although that is disclosed as a preferred embodiment, the claim only requires that the diagnoses be "displayed."

There is also no support for construing this limitation under 35 U.S.C. § 112, para. 6. The claim does not use the word "means," and the structure for performing the function, a

-23-

software module in a "computerized system," is included in the claim. *See Personalized Media Communications,* 161 F.3d at 703-4. This is just another attempt to improperly read limitations of the preferred embodiments into the claim.

18. **emsCharts proposes that "marking selected information" used in Claim 14 means "preparing an administrative notification to a third party, such as administrators, collectors, insurers, supervisors, medical directors and government organizations, for future review of certain specific information."**

emsCharts cites col. 3, lns 46-53; col. 17, lns 28-41; col. 19, ln 54 to col. 20, ln 3 as intrinsic support for its construction. However, emsCharts is confusing this claim term with the various definitions of a "sentinel event" provided in the patent. "Marking" simply means "identifying" in this context. *See also* Ex. C at 830 (defining "mark").

19. **emsCharts proposes that "sentinel event(s)" used in Claims 14, 20 and 21 means "action during the patient encounter that requires future review by a third party."**

emsCharts cites col. 3, lns 46-53; col. 17, lns 28-41; col. 19, ln 54 to col. 20, ln 3 as intrinsic support for its construction. However, as discussed above in Golden Hour's proposed claim constructions, the term "sentinel event" is defined more broadly in various ways in the '073 patent so is not as limited as suggested by emsCharts. *See* Ex. A. at 3:48-53, 12:45-52, 17:30-35, 19:62-64.

20. **emsCharts proposes that "patient encounter record / encounter record" used in Claims 15, 16 and 17 means "an account of all events that occurred from the beginning to the end of a patient incident, including flight information relating to an emergency transport crew dispatch."**

emsCharts cites col. 2, lns 25-33; col. 4, lns 33-42; col. 4, ln 55 to col. 5, ln 19; col. 9, lns 36-58; col. 11, lns 29-45; col. 17, lns 1-41; col. 18, ln 45 to col. 19, ln 5 as intrinsic support for its construction. However, despite the numerous citations to the specification, not one supports the notion that "all events that occurred from the beginning to the end of a patient incident" must be recorded. Furthermore, emsCharts fails to define what it means by "all events" as the term could not possibly be taken literally. Claim 15 only requires that the patient encounter record be "indicative" of the clinical encounter. *See also* Ex. C at 1142 (defining "record").

21.   emsCharts proposes that "<u>patient information</u>" used in Claims 15, 19 and 22 means "patient demographic information, incident information, physical exam data, diagnosis, treatments administered."

emsCharts cites col. 7, ln 9 to col. 9, ln 35; col. 16, ln 50 to col. 18, ln 44 as intrinsic support for its construction.   However, these citations merely disclose examples of such information and do not limit the claims to include all such examples.   *See also* Ex. C at 698 (defining "information").   This claim term needs no construction.

22.   emsCharts proposes that "<u>clinical encounter</u>" used in Claims 15 and 17 means "an incident where a patient is engaged with an emergency medical crew for the purpose of medical assistance."

emsCharts cites col. 2, lns 25-33; col. 9, lns 37-58; col. 18, ln 63 to col. 19, ln 5 as intrinsic support for its construction.   However, the claim already provides that the "clinical encounter [is] associated with a patient incident requiring emergency medical care by the emergency transport crew."   Therefore, this definition is redundant and if substituted into the claim would render it incomprehensible.   This would only confuse the jury.   This claim term also needs no construction.

23.   emsCharts proposes that "<u>integrating the patient information</u>" used in Claims 15 and 22 means "collecting all information related to a patient incident in a common database."

emsCharts cites col. 1, ln 49 to col. 2, ln 3; col. 11, lns 9-26; Amendment pgs 3-5 as intrinsic support for its construction.   However, none of these citations require that "all" information related to a patient incident be collected in a "common" database.   The claim merely requires integrating collected patient information with collected flight information to produce an encounter record.   *See also* Ex. C at 706 (defining "integrate").   Also, a system having a "shared database" is specifically required in dependent Claim 8.   This limitation should therefore not be read into other broader claims that do not explicitly require a "shared" or "common" database. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

**24.     emsCharts proposes that "generating statistical information" used in Claim 17 means "performing numerical calculations producing new statistical data."**

emsCharts cites col. 4, lns 33-42; col. 15, lns 20-26 as intrinsic support for its construction. However, none of these citations require that numerical calculations be performed to produce "new statistical data," and emsCharts does not explain what this proposed new claim term means in the context of the '073 patent. The claim covers any "generation" of statistical information, such as "number of transport requests" that may not require numerical calculations. See Ex. A at 4:35-37.

**25.     emsCharts proposes that "justify the cost of" used in Claim 17 means "demonstrate in the mind of the insurance company or other payer the reasonableness of the amount of the bill." emsCharts also contends that the term "justify" cannot be construed because it is indefinite.**

emsCharts cites col. 11, lns 58-65 as intrinsic support for its construction. However, this citation does not discuss this claim term. The specification at other locations discusses letters of justification. *See* Ex. A at 3:56, 9:44; *see also* Ex. C at 738 (defining "justify"). There is no requirement that the reasonableness of the bill be demonstrated in the mind of a payer. If substituted into the claim, emsCharts' proposed construction would render it incomprehensible and of no help to the jury. This claim term needs no construction.

**26.     emsCharts proposes that "automatically collecting patient information from emergency medical equipment" used in Claim 19 means "storing data in a database at a common server without human intervention."**

emsCharts cites col. 1, ln 65 to col. 2, ln 3; col. 3, lns 44-47; col. 8, lns 9-11 as intrinsic support for its construction. However, these citations do not require a "common" server and do not preclude "human intervention." Also, the specification clearly provides that the clinical software may reside in a server or in a portable computer. Ex. A at 4:66 to 5:3. If substituted into the claim, emsCharts' proposed construction would create a new and very different claim and be of no help to the jury. Furthermore, a system having a "shared database" is specifically required in dependent Claim 8. This limitation should therefore not be read into other broader claims that do not explicitly require a "shared" or "common" database. *See Liebel-Flarsheim*, 358 F.3d at 910.

     **27.    emsCharts proposes that "<u>flag</u>" used in Claim 21 means "mark for identification."**

emsCharts cites col. 18, lns 37-44; col. 19, lns 43-47; col. 20, lns 32-34 as intrinsic support for its construction.  However, "flag" as used in the claim is a noun, not a verb.  *See also* Ex. C at 516 (defining "flag").  Also, the claim already includes "the step of marking" and so emsCharts' proposed construction is redundant and of no help to the jury.  This claim term needs no construction.

     **28.    emsCharts proposes that "<u>internally consistent</u>" used in Claim 22 means "verifying that different data stored in a common database are compatible."**

emsCharts cites col. 1, ln 49 to col. 2, ln 3; col. 13, lns 17-34 as intrinsic support for its construction.  However, this consistency check between the dispatch and clinical modules is described in the '073 specification, *see* Ex. A at 16:56-65, and does not require a "common" database.  A system having a "shared database" is specifically required in dependent Claim 8.  This limitation should therefore not be read into other broader claims that do not explicitly require a "shared" or "common" database.  *See Liebel-Flarsheim*, 358 F.3d at 910.  Also, if substituted into the claim, emsCharts' proposed construction would render it incomprehensible and of no help to the jury.  This claim term needs no construction.

## VI. <u>CONCLUSION</u>

emsCharts' proposed claim constructions attempt to re-write the asserted claims to include numerous additional limitations and thereby only invite error. Many of emsCharts' proposals would only render the claims more complex and confusing to the jury. As discussed above, for all but a few claim terms where some Court construction may prove helpful to the jury, the heavy presumption of according the claims their ordinary and customary meanings should apply. For the foregoing reasons, the Court is respectfully requested to adopt Plaintiff Golden Hour's proposed claim constructions and reject those of Defendant emsCharts.

Respectfully submitted,

KNOBBE MARTENS OLSON & BEAR LLP

Dated: February 25, 2008

By: /s/ Frederick S. Berretta
    Frederick S. Berretta (State Bar No. 144,757)
    fred.berretta@kmob.com
    Boris Zelkind (State Bar No. 214,014)
    boris.zelkind@kmob.com
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    550 West C Street, Suite 1200
    San Diego, CA  92101
    Telephone:  (619) 235-8550
    Facsimile:  (619) 235-0176

    S. Calvin Capshaw, *Lead Attorney*
    (State Bar No. 03783900)
    ccapshaw@mailbmc.com
    Elizabeth L. DeRieux (State Bar No. 05770585)
    ederieux@mailbmc.com
    Andrew W. Spangler (State Bar No. 24041960)
    aspangler@mailbmc.com
    BROWN MCCARROLL, L.L.P.
    1127 Judson Road, Suite 220 (75601)
    P.O. Box 3999
    Longview, Texas 75606-3999
    Telephone: (903) 236-9800
    Facsimile:  (903) 236-8787

    Attorneys for Plaintiff and Counterdefendant
    GOLDEN HOUR DATA SYSTEMS, INC.

4917446

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 25th day of February, 2008, the foregoing document:

**PLAINTIFFS' GOLDEN HOUR DATA SYSTEM, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** was filed electronically in compliance with Local Rule CV-5(a). As such, the document was served on all counsel who have consented to electronic service. Local Rule CV-5(a)(3)(A).

Luz Wright)