**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GOLDEN HOUR DATA SYSTEMS, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:06-CV-381 |
| | § | |
| EMSCHARTS, INC., ET AL., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

After considering the submissions and the arguments of counsel, the Court issues the following order concerning the claim construction issues:

**I.      Introduction and Background**

Plaintiff Golden Hour Data Systems, Inc. ("Golden Hour") accuses emsCharts, Inc. and Softtech, LLC (collectively, "Defendants") of infringing claims 1, 6-8, 10 and 12-22 of United States Patent No. 6,117,073 ("the '073 patent"). Claims 1, 10 and 15 are independent claims. Claims 1, 6-8, 10 and 12-14 are apparatus claims, whereas claims 15-22 are method claims.

The '073 patent is directed to an integrated medical database for use in the emergency medical transportation industry. The Background of the Invention section summarizes the basic concept of the invention: "what is needed is a comprehensive system that includes modules for dispatching emergency medical teams, tracking their movement to and from the accident scene, managing a clinical diagnosis and treatment and accurately billing the patient for the services rendered." '073 Patent at 1:66-2:3. The abstract of the patent states:

> An integrated medical database system for the emergency medical transportation business is disclosed. The system includes a dispatch module, clinical module, administration module and billing module. Each module may communicate data

with one or more of the other modules to form a system incorporating data sharing, thus achieving an end-to-end automation of emergency medical care accounting. Internal consistency checks are performed by the system to ensure that proper treatments are performed according to a chosen diagnosis.

Claim 1 of the '073 patent is reproduced below:

> 1. A computerized integrated data management system for tracking a patient incident, comprising:
> a first module capable of dispatching an emergency transport crew specific to a patient incident requiring emergency medical care by the emergency transport crew, wherein transportation tracking information relating to the dispatch is recorded; and
> a second module capable of receiving information from the first module and billing the patient appropriately for costs indicative of the patient incident, including transportation costs.

'073 Patent at 20:61-21:4.

## II.     General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id*. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id*. "One purpose

for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed

to and intended to be read by others skilled in the particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (*quoting Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less

useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not

impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant. The court now turns to a discussion of the claim terms.

### III.    Agreed Constructions

The parties have agreed to the following constructions:

- "**transportation tracking information**" means "information about the movement of the emergency transport crew;"

- "**appropriately**" means "accurately;"

- "**instructions for dispatching**" means "computer software for issuing a request to deploy to a destination;"

- "**instructions for tracking**" means "computer software for automatically storing positions on;"

- "**capable of interpreting data**" means "able to process diagnostic information;"

- "**determining a diagnosis**" means "generating information about a medical finding, condition, or disease;"

- "**instructions for displaying**" means "computer software for generating to a visual output device;"

- "**diagnoses**" means "a medical finding, condition, or disease;"

- "**instructions for marking**" means "computer software for identifying;"

- "**sentinel event**" means "any action during a patient encounter that might require further review, or a major happening that might require notification to a third party, or an event that is worthy of special attention;"

- "**collecting flight information**" means "automatically or manually gathering and automatically storing information about a flight;"

- "**collecting patient information**" means "automatically or manually gathering and automatically storing information about a patient;"

- "**produce an encounter record**" means "create an electronically accessible collection of information;"

- "**capable of dispatching**" means "able to issue a request to deploy to a destination;"

- "**patient encounter record**" means "a collection of electronically accessible information about a patient encounter;" and

- "**marking sentinel event**" means "identifying any action during a patient encounter that might require further review, or a major happening that might require notification to a third party, or an event that is worthy of special attention."

## IV.     Disputed Constructions

### 1.     "integrated data management"

Golden Hour proposes that this term carry its plain and ordinary meaning. The defendants propose that this term mean "uses a common format with a common language and a common server for all modules and functions."

The term "integrated data management" appears in the preamble of independent claims 1 and 10. With respect to the preamble, "a preamble generally limits the claimed invention if it 'recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim.'" *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305 (Fed. Cir. 2005) (*citing Catalina Mktg. Int'l. Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)). The plaintiff does not dispute that the preamble is limiting in this case. Rather, the plaintiff contends the term should carry its ordinary meaning.

The defendants argue that "integrated" requires a greater degree of interdependence than merely "connected" or "interfaced." *See* Defendants' Response at 6 ("dictionary definitions of

'integrated' include '[t]o bring together or incorporate (parts) into a whole,' . . . and '[t]o make into a whole by bringing all parts together; unify,' . . . [a]ccordingly, the 'modules' comprising the claimed 'integrated' data management system should be construed to be part of a unified whole, instead of, for instance, simply being 'connected' or 'interfaced'). The defendants then make the assertion that "[i]n terms of the '073 patent's disclosure, in order to be 'integrated,' the parts must share common data formats, a common language, and a common processor." *Id.* at 7.

To support this proposition, the defendants cite to various portions of the specification including, Figs. 1 and 3, as well as, column 11 at lines 9-26. This intrinsic evidence, however, does not support such a narrow construction of the term "integrated." Perhaps the only support that can be found for the defendants' construction is in the Background of the Invention section. The patent, in discussing problems in the art, states that "even seemingly simple tasks of communicating among the various entities, as well as among sections of a single providing entity, is severely hampered by *the lack of a common communication format*." '073 Patent at 1:36-40 (emphasis added).

The specification, however, contemplates a system that does not use a common format or common language. For example, the specification teaches that the embodiment can "run in a standard Windows/Macintosh point-and-click office environment," and "other standard or non-standard computer environments may support an implementation of the present invention." '073 Patent at 4:21-31. Moreover, the patent teaches the use of different methods of communication that have their own format and protocols - "Integrated Services Digital Network (ISDN) lines, Digital Satellite Systems (DSS) or digital wireless systems may also be used for communication." '073 Patent at 3:32-34. The defendants' proposed definition would preclude any data conversions or any variation in the transfer protocols used through the system.

The defendants further propose that the system should be limited to a common server. See Defendants' Response at 7 ("In terms of the '073 patent's disclosure, in order to be 'integrated,' the parts must share common data formats, a common language, and a *common processor*.") (emphasis added). The defendants rely, in part, on Figure 1 to support the need for a common server. Figure 1, however, is "one embodiment of the medical database system" described in the patent. '073 Patent at 4:8-10. Nothing in the intrinsic record warrants limiting the claims to this embodiment. To the contrary, the specification explicitly teaches that the functionality of the server 12 can be distributed to other computers in the system. See '073 Patent at 4:66-5:3 ("The portable computer 30 can include clinical and diagnosis modules . . . or can act as a terminal to communicate with these modules on the server computer 12").

In both claims 1 and 10, the "second module" limitation requires that it is "capable of receiving information from the first module." *See e.g.*, '073 Patent at 21:1-2. In light of the specification, the patentee envisioned an "integrated" system in the sense of the ability to transfer information throughout the various functions of an emergency response. The court is persuaded that one of skill in the art would read the claim in this manner, and therefore rejects the defendants' proposed construction.

In light of rejecting the defendants' construction, the court construes the term "integrated data management" to mean "a system with the capability to transfer information throughout the various functions of an emergency response."

    2.    **"integrating the patient information"**

Though the parties grouped this term with "integrated data management" for briefing purposes, the court construes this term separately. The term "integrating the patient information"

appears in independent claim 15, which recites "integrating the patient information with the flight information to produce an encounter record . . . ." '073 Patent at 22:4-5. The patent distinguishes the present invention from the prior art by pointing out that the prior art "does not provide comprehensive integration of the flight information with a clinical diagnosis, billing system and administration system." '073 Patent at 1:55-57. The Detailed Description explicitly states that the present invention "integrates all aspects of patient record documentation into a single complete electronic chart." '073 Patent at 3:21-23. In light of the express language of the claims, read in light of the specification, the court construes "integrating the patient information" to mean "combining the patient information."

### 3. recorded

Golden Hour proposes that this term mean "automatically stored." Defendants propose this term carry its plain and ordinary meaning.

The plaintiff argues that the "patent undeniably describes the dispatch module as an automated and computerized system, and provides no indication that it includes anything other than an automated recording system." *See* Plaintiff's Reply at 7-8.

The specification evidences that the patentee made a distinction between "recorded" and "automatically record" because both terms appear in the specification. *Compare* '073 Patent 6:59-60 ("recorded automatically"), *with* 6:65 ("recorded"). The defendants also argue that other, non-asserted, claims demonstrate the patentee's intention not to restrict the term "recorded" in the manner proposed by the plaintiff. *See* Defendants' Response at 9. For example, claim 24 further limits the term "collecting" in claim 23 by reciting: "wherein the collecting step includes automatically collecting... from emergency medical equipment." '073 Patent at 22:34-47.

Nothing in the claims, specification, or prosecution history indicates that the term "recorded" should be limited to data that is "automatically" recorded. The court agrees with the plaintiff, however, that in the context of the intrinsic record, the term "recorded" as used in the claims refers to storing the information. Therefore, the court construes the term "recorded" to mean "stored."

## V.   Conclusion

The Court adopts the constructions set forth in this opinion for the disputed terms of the '073 patent. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

SIGNED this 23rd day of June, 2008.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE