**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| GOLDEN HOUR DATA SYSTEMS, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:06 CV 381 |
| | § | |
| EMSCHARTS, INC., ET AL., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

## I.   BACKGROUND

In this case, plaintiff Golden Hour Data Systems Inc. ("Golden Hour") obtained a jury verdict

of infringement against defendants emsCharts Inc. and Softtech LLC (collectively "Defendants")

with respect to United States Patent No. 6,117,073 ("the '073 patent). *See* Dkt. No. 202 (Jury

Verdict). The court conducted a bench trial on March 5, 2009, to resolve emsCharts' defense of

inequitable conduct.

## II.   LEGAL STANDARDS

"A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent

to mislead or deceive the examiner, fails to disclose material information or submits materially false

information to the PTO during prosecution." *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d

1309, 1313 (Fed. Cir. 2006); *see also* 37 C.F.R. § 1.56(a) ("Each individual associated with the filing

and prosecution of a patent application has a duty of candor and good faith in dealing with the

Office, which includes a duty to disclose to the Office all information known to that individual to

be material to patentability as defined in this section.").

The materiality of information withheld during prosecution may be judged by the "reasonable examiner" standard. *See id.* at 1316. That is, "[m]ateriality . . . embraces 'any information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent.'" *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1382 (Fed. Cir. 1998) (citations omitted). Moreover, "[i]nformation concealed from the PTO may be material even though it would not invalidate the patent." *Li Second Family LP v. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir. 2000). "However, a withheld otherwise material [piece of information] is not material for the purposes of inequitable conduct if it is merely cumulative to that information considered by the examiner." *Digital Control Inc.*, 437 F.3d at 1319 (Fed. Cir. 2006). "[T]he scope and content of prior art and what the prior art teaches are questions of fact." *Id.*

"The intent element of the offense is . . . in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred." *Akron Polymer*, 148 F.3d at 1385. "However, inequitable conduct requires not intent to withhold, but rather intent to deceive. Intent to deceive cannot be inferred simply from the decision to withhold [information] where the reasons given for the withholding are plausible." *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003). In addition, "a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (en banc in relevant part).

"The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence." *Digital Control*, 437 F.3d at 1313. "The court must then

determine whether the questioned conduct amounts to inequitable conduct by balancing the levels

of materiality and intent, 'with a greater showing of one factor allowing a lesser showing of the

other.'" *Id.* (quoting *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed. Cir.

2001)).

## III.   DISCUSSION

Defendant emsCharts argues that Golden Hour, specifically Dr. Hutton (the inventor of the

'073 patent) and its prosecution counsel (Michael Fuller and John Carson) committed inequitable

conduct by (1) making false statements to the Patent and Trademark Office ("PTO") about the most

relevant prior art system, the AeroMed system; and (2) failing to disclose a brochure describing the

AeroMed System.[1]  The court provides the following time line of events relevant to the prosecution

of the '073 patent:

| | |
|---|---|
| 1992 | Dr. Hutton posits that he, along with one other doctor, began developing the ideas that eventually became the inventions claimed in the '073 patent. |
| September 1996 | Air Medical Transport Conference ("AMTC") in Dallas, TX |
| February 5, 1997 | Golden Hour Consulting incorporates into Golden Hour Data Systems, Inc. |
| July 1997 | Golden Hour retains Knobbe Martens for patent prosecution.  Patent Agent Michael Fuller ("Fuller"), under John Carson's ("Carson") supervision, begins preparation of the '073 patent application.[2] |

---

[1] Defendant emsCharts also argues that Golden Hour committed inequitable conduct by not disclosing material information regarding the public use or offers to sale its own LifeNet system.  The court, however, does not find that the evidence is clear and convincing to prove that either counsel or Dr. Hutton intended to deceive the PTO by not disclosing Golden Hour's prefiling activities.  *See Hoffmann-La Roche, Inc. v. Promeega Corp.*, 323 F.3d 1354 (Fed. Cir. 2003).

[2]Fuller has now completed law school and is a practicing attorney at Knobbe, Martens. Carson was Fuller's supervising attorney at the time the '073 application was filed.

March 2, 1998          '073 application filed discussing AeroMed as prior art in "background of
                       invention" section

March (late), 1998     Association of Aeromedical Services Midyear Conference.  Hutton testified
                       he must have received the AeroMed brochure at issue at this conference.

August 4, 1998         IDS filed identifying AeroMed Software (brochure not submitted)

September 12, 2000     '073 patent issues

January 22, 2001       Golden Hour sends letter to Charles Freeman ("Freeman"), inventor of the
                       AeroMed system, suggesting his product may be infringing its '073 patent

First, although the evidence emsCharts presents to prove that Dr. Hutton and prosecution

counsel knew they were making false statements to the PTO at the time of filing the patent

application is persuasive, it does not rise to the level of clear and convincing evidence needed to find

inequitable conduct.  Nevertheless, the court finds that the evidence is clear and convincing that, at

least by late March of 1998, both Dr. Hutton and prosecution counsel possessed the AeroMed

brochure and knew at the very least what they had told the patent office in the initial patent

application was false.  No one attempted to correct those misrepresentations that went directly to the

patentability of the claims as submitted.  As discussed below, the court agrees with Defendant

emsCharts that this conduct renders the patent unenforceable.

A.      Materiality

Golden Hour argues that the information in the AeroMed brochure at issue was not material

under the reasonable examiner standard or Rule 56(b)(2).  Golden Hour maintains that the brochure

could not have been material to a "reasonable examiner" because the examiner would not have

considered the undated brochure.  Additionally, Golden Hour argues that the information did not

refute, nor was it "inconsistent with, a position the applicant [took] in . . .[a]sserting an argument of

patentability" under 56(b)(2). Both of Golden Hour's arguments, however, completely disregard the

applicant's and counsel's continuing duty of candor.  The court, therefore, rejects both arguments.

### 1.     The AeroMed Brochure

To aid in understanding the relevance of the brochure, the court provides a reproduction of

both sides:



**Figure 1 (front of brochure)**

## DISPATCH Module

The AMS Dispatch Module can be used with the Flight Management Module or as a stand-alone system. It is an integrated real-time flight dispatching program used to log incoming requests, find coordinates of landmarks such as hospitals, road intersections, airports, towns, etc., produce flight plans, and dispatch the aircraft. It is extensively menu and hotkey driven and is FAST - the aircraft can be dispatched as quickly as the information is gathered.

### DISPATCH ADVANTAGES

 Calculates navigation for entire flight plan; displays nearest aircraft to scene. Can use the Yeoman plotter as a waypoint input device. Database of all US Towns, Airports, and Navaids is included.

 Pop-up windows display navigation information, radio frequencies, LZ descriptions, etc.

Up to 995 vehicles tracked simultaneously; unlimited pending request queue.

Real-time flight tracking. Hotkeys show nearest trauma center, airport, etc. Graphical flight path display. Yeoman Plotter can display position fixes.

 Automatically activates alphanumeric pagers.

## FLIGHT MANAGEMENT Module

The Flight Management Module is a companion to the Dispatch Module. All information entered by the Dispatch Module is combined into Flight Management so that duplicate data entry is eliminated.

The entire in-flight medical record is stored in the database for each flight.

Entering a flight sheet into the Flight Management Module is as easy as pointing and clicking on the item choices. Vital Signs can be downloaded directly from Propaq and Escort monitors. Help lines and data validation help users to enter correct data.

Billing becomes a breeze with the user definable reports. Patient charges can be calculated and printed any number of ways to include transport time and itemizing of medical supplies.

Medical Justification forms can be generated automatically, either single printouts per patient or as a batch at the end of the month.

AMS maintains information on hospitals, physicians, and EMS agencies, so your time spent on marketing and followup letters is reduced. With the mail merge system, producing them becomes effortless.

 Quality assurance reports are another key feature of the program. Data entry is audited for completeness and user db lists are printed to prompt crew members to enter missing data. QA summaries and tables allow a quick visual check for compliance. User-defined queries allow you to get the answers you need.

Statistics: Reports are a breeze with AMS. Some of the reports include:

AAMS Data Summary
Flight Requests by Type and Disposition
Time and Mileage Summary
Source, Destination, and Weather
Hour of Day, Day of Week, Duration
Medical Category and Diagnosis
Medical Category by Referring Agency
Referring and Receiving Agencies
Referring and Receiving Physicians
Flight Crew Activity
Procedures performed by Crew
Monthly Charges Summary
Non-Chargeable Flights
Pilot and Aircraft Logs
Daily Logs, Sorted as desired
Personal Flight Logs
FLORIDA STATE HRS Report

## ContinuED Module

Integrates with Flight Management. Keeps track of seminars and courses attended by your staff, and prints out biennial reports to satisfy National Registry of EMTs requirements. Keeps tabs on expiring certifications. Logs skills performed by staff while not flying. Helps you to plan your continuing education needs and keep everyone current.

GHDS081135

**Figure 2 (inside of brochure)**

6

The only prior art discussed by name in the patent application was the AeroMed system.  In the "Description of the Related Technology" section of the patent, Dr. Hutton and Knobbe, Martens stated:

> Current document procedures in the air medical transport industry are based on an inefficient paper and pencil technology . . .
>
> . . .
>
> This is especially evident when certain aspects of the system (such as computerized clinical laboratory result displays) have been upgraded with a uniquely tailored computerized system, while the remaining functions are still performed in an archaic manner. While the upgraded system may be effective for one singular aspect, such as dispatching, lab reporting, or chart dictating, the remainder of the system does not improve its effectiveness due to the other archaic components.
>
> **Although others have attempted to remedy this conflict, no fully integrated medical systems have been developed. For example, the Air Medical Software (Innovative Engineering of Lebanon, N.H.) provides computer software for dispatching emergency crews to accident scenes and managing flight information.  However, it does not provide comprehensive integration of the flight information with a clinical diagnosis, billing system and administrative system.**

['073 patent 1:11-57] (emphasis added)

The brochure describes AeroMed significantly different from the description of AeroMed in the patent application.  Specifically, the brochure stated "[t]he AMS Dispatch Module can be used with the Flight Management Module or as a stand-alone system." [AMS Brochure, inside top left column]  The brochure went on to say that with the Flight Management Module "[b]illing becomes a breeze with the user definable reports.  Patient charges can be calculated and printed any number of ways to include transport time and itemizing . . ." [AMS Brochure, inside top center column.]  Indeed, the brochure made clear that "the Flight Management Module is a companion to the

"Dispatch Module" and "[a]ll information entered by the Dispatch Module is **combined into** Flight Management so that duplicate data entry is eliminated." *Id.* (emphasis added) This clearly contradicts what both Dr. Hutton and prosecution counsel had represented to the PTO in the application.

Dr. Hutton maintains he did not have the brochure at the time of filing and that the statements made in the patent application are consistent with his understanding of the AeroMed system and its limitations when he filed the application. Dr. Hutton testified at the jury trial that he learned of the AeroMed system from a colleague, Dr. Ira Blumen, who told him "there was no integration with the billing system and billing was very difficult for them at the University of Chicago." [Trial Tr. 105:4-6][3] Also, Golden Hour relies on its draft Business Plan, and other documents describing the problems with the then current technology, to demonstrate Dr. Hutton's then understanding of AeroMed's limitations. While Dr. Hutton's understanding at the time of filing may have been that the AeroMed system had no integrated billing, the brochure clearly calls that understanding into question.

The parties dispute both when Dr. Hutton received the AeroMed brochure and gave it to his prosecution counsel.[4] Until the eve of the bench trial, Dr. Hutton maintained he could not recall when

_____

[3] Dr. Hutton's testimony in the jury trial about his understanding of AeroMed's limitations is inconsistent with other evidence in the record, and with his testimony in the bench trial on inequitable conduct. For example, Dr. Hutton proffered evidence in both the jury trial and bench trial to prove that he did not understand AeroMed to have electronic billing at all. In the bench trial, however, he testified that he knew there *was* billing, but that it was not integrated. Dr. Hutton further testified in the bench trial that because of the way AeroMed did billing, it was clear to him that Freeman (the inventor of AeroMed) did not understand billing. [Ineq. Cond. Tr. 154:15-155:16] A system which lacks billing is very different from a system having billing that does not function properly.

[4] Freeman (inventor of AeroMed) testified at the jury trial that Dr. Hutton must have gotten the brochure at the 1996 AMTC Conference. Indeed, the brochure was not produced by Golden Hour until the eve of trial. Golden Hour claims the reason for the late production was that it was in Dr. Hutton's *intake file*, which had not been reviewed for disclosures. If so, Dr. Hutton would have had the brochure at the time of filing and Golden Hour's reason for not

he received the brochure.[5]  At the bench trial, however, Dr. Hutton recalled getting the brochure in late March of 1998 at the AeroMedical Services Midyear Conference.  Even accepting this as true, Dr. Hutton can find little comfort in admitting to not disclosing such material information received *less than one month* after filing his patent application.  The fact the brochure is undated is not determinative of the consequences of not disclosing it, or the information contained therein, to the PTO.

### 2.      Reasonable Examiner Standard

First, Golden Hour argues that the patent examiner would not have considered the brochure, therefore, it could not have been material to a "reasonable examiner."  It is undisputed that the AeroMed brochure is undated.  Fuller testified that pursuant to MPEP 609 and 37 C.F.R. § 1.98(5) it was his practice not to submit undated materials to the Patent Office after filing.  [Ineq. Cond. Tr. 83:19-89:7].  MPEP section 609 instructs examiners not to consider references included in an IDS which do not comply with 37 C.F.R. section 1.98.  37 C.F.R. § 1.98(5) requires that "each publication . . .must be identified by publisher, author (if any), title, relevant pages of the publication, *date*, and place of publication." (emphasis added).  Golden Hour maintains, therefore, that no reasonable examiner would have considered the brochure material to patentability–the rules would have precluded him from considering the undated brochure obtained after the filing date.

As stated above, the court takes as true that Dr. Hutton did not have the undated brochure until late March of 1998 (after filing).  Neither Dr. Hutton nor his prosecution counsel, however, provided

---

disclosing the undated brochure would fail.

[5]  Even as recent as Golden Hour's response briefing for the inequitable conduct trial, Dr. Hutton maintained "he has no specific recollection of how or when he obtained [the brochure]." Dfts. Resp. Brf. at 7.

the PTO with the information in the brochure or the brochure itself after receiving it.  Further, they

failed to submit the brochure with the August 4, 1998 IDS.  Prosecution counsel concedes that it had

the brochure at the time the IDS was filed. As such, he and the patentee had a duty to disclose it.  The

IDS states:

> [a]pplicants are aware of AeroMed Software, computer software for Air Medical
> Dispatch, Flight Program Management, Medical Charting, Continuing Education
> Tracking, Transfer Center, Physician's Referral Lines, and Custom Applications.
> AeroMed Software is a product of Innovative Engineering of Lebanon, New
> Hampshire.

This description of the AeroMed system is an exact duplicate of the description of the system on the

front of the brochure.  Prosecution counsel admits that the only explanation is that counsel copied the

language from the front of the brochure when it submitted the IDS. [Ineq. Cond. Tr. 95:1-5]  Even

so, counsel maintains it was entirely proper not to submit the entire brochure to the patent office along

with the IDS, even though it was inconsistent the disclosure in the IDS, and inconsistent with how

it had described the AeroMed system in the original application.

Golden Hour's reliance on  MPEP section 609 and 37 C.F.R. section 1.98(5) for support fails

to account for the breach of its and counsel's ongoing duty of candor.  These rules do not provide a

safe harbor from inequitable conduct.  *Semiconductor Energy Laboratory Co., Ltd. v. Samsung*

*Electronics Co., Ltd.*, 204 F.3d 1368 (Fed. Cir. 2000).  The rules merely provide a floor for what

required submissions must include. *Id.*  In *Semiconductor*, the inventor had technically complied with

MPEP 609 when providing the PTO with partial translations of a prior art reference.  The plaintiff

argued its "technical compliance with the PTO Rules should weigh against an inference of intent to

deceive the examiner." *Id.* at 1375.  The Federal Circuit held, however, that a "one-page partial

translation did not discuss [a relevant] teaching. Given the critical absence of this teaching from the

partial translation and his knowledge of this absence, '[i]t was incumbent upon [the inventor] to provide the PTO with sufficient information for a reasonable examiner to consider the [submission] in context, not with a selective and misleading disclosure. The inventor[ ] failed to do that and cannot post facto hide behind the MPEP guidelines to argue that what [he] did with a purpose should be disregarded.'" *Id.* (internal citations omitted).  Such is the present case.  Fuller selected that part of the brochure to disclose that did not threaten patentability.  He excluded, however, the entire teaching that would have been a serious obstacle to patentability.  There can be no question that a "reasonable examiner" would have considered the information in the brochure material.

### 2.      Materiality under 56(b)(2)

Second, Golden Hour argues that emsCharts' argument that the brochure was material under 56(b)(2) fails because it never made an "argument of patentability" regarding billing in any office action.  Golden Hour's reading of 56(b)(2) is overly restrictive, however.

As discussed above, the inventive feature of the '073 patent was billing integration.  The specification made that clear.  Indeed, in the *one* Office Action issued before the application was allowed, the examiner stated: "[t]he prior art teaches systems and methods of computerized integrated data management, but does not teach or suggest a computerized method that includes collecting and integrating patient information with flight information to produce an encounter record, as set forth in the claims."  Golden Hour can hardly argue now that its representation of AeroMed in the '073 patent application was not an "argument for patentability."  It is clearly how the examiner distinguished AeroMed from the invention disclosed in the '073 patent.  Golden Hour can point to no law suggesting that only those arguments used to overcome a rejection from the PTO are "arguments of patentability."  Indeed, this argument is fundamentally wrong.  A patent application

11

is making an argument for the patentability of an applicant's invention. It is describing how and why the invention is novel and not obvious. For this reason, everything represented to the patent office during the prosecution of a patent application is an "argument for patentability."

### B.      Intent

Having found materiality, the court turns to whether Golden Hour possessed the requisite intent to deceive the PTO. Intent is a separate inquiry from materiality. *Larson Mfg. Co. of South Dakota, Inc. v. Aluminart Products Ltd.*, _ F.3d _ (Fed.Cir. 2009); 2009 WL 691322. However, "a high degree of materiality, coupled with evidence that the applicant should have known of that materiality, creates a strong inference of an intent to deceive." *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1376 (Fed. Cir. 2007). The court finds there is clear and convincing evidence of an intent to deceive the PTO.

Dr. Hutton testified that he gave his counsel the brochure soon after obtaining it. [Ineq. Cond. Tr. 109:1-14]. The '073 patent application was filed on March 2, 1998. Dr. Hutton can not claim he did not find the brochure material. He considered the brochure material if he thought it important enough to give to his prosecution counsel soon after obtaining it. The information in the brochure about AeroMed was inconsistent with what had been represented to the PTO in the application. Both Dr. Hutton's and his prosecution counsel's ongoing duty of candor compelled disclosure of the information and brochure to the PTO. Doing so, however, would have certainly threatened the invention's patentability.

Fuller claims ignorance of what was in the brochure. Counsel testified he does not recall

reading the description of AeroMed's billing in the brochure.[6] [Ineq. Cond. Tr. 95:20-99:13] That testimony is inconsistent. Counsel testified the only explanation for exact replica of the language from the brochure was that he only looked at the front of the brochure and not the inside. *Id.* If counsel did not submit the brochure because it was undated, he must have at least done a cursory review of the brochure to determine there was no date. Even the most cursory of reviews would have revealed the description of AeroMed's billing and integration–the only thing described in the center column of the one page brochure.

Further, the IDS disclosed only that part of the brochure that did not threaten the patentability of the invention. The language was lifted directly from the front of the brochure. It was incumbent upon Golden Hour "to provide the PTO with sufficient information for a reasonable examiner to consider the [brochure] in context, not with a selective and misleading disclosure." *See Semiconductor Energy,* 204 F.3d at 1375. Here, Golden Hour and its counsel selected the one part of the AeroMed brochure to disclose what was consistent with how it had described AeroMed to the PTO. Furnishing the entire brochure would have revealed the inconsistencies between Golden Hour's description in the application and the truth about the AeroMed system. Such selectivity is strong evidence of intent to mislead the patent office about the relevant prior art system as described by its competitor.

This court is well aware that "[g]ross negligence is not sufficient" to support a finding of intent to deceive the patent office. *Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1360 (Fed. Cir. 2008) (citing *Kingsdown Med. Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed.

---

[6]Fuller argues, however, that even if he would have read the description of billing he would not have disclosed it. He maintains the lack of a date renders it immaterial.

Cir. 1988) (en banc)).  The evidence presented by emsCharts to this court, however, exceeds that of

gross negligence.  At best, prosecution counsel chose not to inquire into the AeroMed brochure at the

risk of revealing something that would hamper the prosecution of the '073 patent.  This court has

recently held that to allow the cultivation of such "deliberate ignorance would condone, and in fact

encourage, those with a duty of candor to act in such a manner." *Medtronic Vascular, Inc. v. Boston*

*Scientific Corp.*, 2008 WL 4147917 at *6 (E.D. Tex. 2008).  Therefore, this court finds that Golden

Hour acted with the intent to deceive the patent office by failing to disclose the material information

about the AeroMed system.

      This court is mindful of the recent Federal Circuit decision addressing the intent prong of

inequitable conduct.  *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., et al.*, Slip Op. 2007-1448

(Fed. Cir. August 25, 2008).  The Federal Circuit held that an accused infringer alleging intent to

deceive "cannot carry its burden simply because [the plaintiff] failed to prove a credible alternative

explanation." *Id.* at 16 (citing *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335,

1340 (Fed. Cir. 2006)).  Additionally, the Federal Circuit found that the accused infringer had a

"major gap" in its proof of intent.  *Id.*  In the present case, no gaps exist, and emsCharts has

discharged its burden to prove intent to deceive.  Although there may not be direct evidence to

support intent, this is rarely if ever available.  The circumstantial evidence leads this court to find that

the single most reasonable inference to be drawn is that Golden Hour intended to deceive the patent

office.  *See, e.g.*, *id.* at 13; *see also Labounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066,

1076 (Fed. Cir. 1992) ("[d]irect proof of wrongful intent is rarely available but may be inferred from

clear and convincing evidence of the surrounding circumstances.") (citations omitted).

      The court also notes that prosecution counsel made no attempt to prepare for the inequitable

conduct hearing to offer an explanation. Counsel testified that he did not even review the application

file before coming to trial. [Ineq. Cond. Tr. 216:3-217:25]  Reviewing the applicant's file in the

instant case was of the utmost importance; especially because counsel was prepared to testify that he

had no recollection of the AeroMed system as described in the brochure. *See Id.*  Instead, he reviewed

only the public file wrapper which provided no aid to resolving the issue before the court.  As a result,

he provided the court with no assistance in determining an alternative explanation for the failure to

provide the PTO with such highly material information.[7]  Again, such cultivated ignorance cannot be

rewarded.

## V.      CONCLUSION

Having found that the threshold levels of materiality and intent are satisfied, the court balances

the high level of materiality with evidence of deceptive intent and concludes that Golden Hour

committed inequitable conduct.  The court therefore concludes that the '073 patent is unenforceable.

IT IS SO ORDERED.

SIGNED this 23rd day of March, 2009.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

---

[7] Counsel could have easily dealt with any fears of revealing privileged information.  He could have simply had another attorney who was not involved in the case remove any privileged information from the application file before his review.