UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| GOLDEN HOUR DATA SYSTEMS, INC.<br>*Plaintiff,* | § § § | |
| | § | CAUSE NO. 2:06-CV-381-JRG |
| V. | § § | |
| EMSCHARTS, INC., ET AL.<br>*Defendants.* | § § § | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

The Court conducted a jury trial in November, 2008.  In that trial, the jury rendered a verdict that Defendant emsCharts, Inc. ("emsCharts") willfully infringed all the asserted patent claims and awarded $3,500,000 to Plaintiff Golden Hour Data Systems, Inc. ("Golden Hour").  *See* Dkt. No. 202 (Jury Verdict).  Importantly, the jury explicitly found that all the asserted patent claims were not invalid by reason of anticipation or obviousness in view of any of the art presented at trial, including the *AeroMed Brochure*.  *See id.* (Jury Verdict affirming validity of claims 1, 6-8, 10, and 12-22 of United States Patent No. 6,117,073 ("the ′073 patent")).  However, the Court subsequently granted Judgment as a Matter of Law ("JMOL") that, among other things, the ′073 patent was unenforceable due to inequitable conduct committed during its prosecution before the United States Patent and Trademark Office ("PTO").  *See* Dkt. Nos. 284 (Inequitable Conduct Order)(Ward, J.).  In reaching this finding, the Court applied the pre-*Therasense* inequitable conduct standard that imposed a lower standard, requiring the Court to balance intent against materiality.  *Id.* at pg. 15 ("Having found that the threshold levels of materiality and intent are satisfied, the court balances the high level of materiality with evidence of deceptive intent and concludes that Golden Hour committed inequitable conduct.")

On Aug. 9, 2010, the Federal Circuit, continuing to apply the pre-*Therasense* inequitable conduct standard, affirmed in part, vacated in part, and remanded for further factual findings on what was intended by the Information Disclosure Statement ("IDS") filed in the '073 patent application that identified the *AeroMed Software System* to the PTO but did not include a copy of the brochure itself. *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1379 (Fed. Cir. 2010), *reh'ng and reh'ng en banc denied* (Nov. 24, 2010.)

On May 25, 2011, before further findings could be made by this Court, the Federal Circuit issued its en banc *Therasense* decision that fundamentally changed the law of inequitable conduct. This development effectively set aside the prior inequitable conduct decision and analysis in this case. *Therasense v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011) (en banc)(hereafter "*Therasense*"). On September 16, 2011, the Court held that *Therasense* created a standard contrary to the law previously applied in this case—particularly with respect to the issue of materiality. Dkt. No. 313. As a result, the Court found it appropriate to re-analyze the inequitable conduct issues under the new standard in *Therasense*. On May 11, 2012, the Court held a bench trial to retry emsCharts' inequitable conduct allegations consistent with *Therasense*.

Pursuant to such bench trial, the Court now makes and enters the following findings of fact and conclusions of law relating to the bench trial held on May 11, 2012:

## II.    FINDINGS OF FACT

### A.  The Original Examination of The ′073 Patent

1.  Golden Hour's ′073 patent, entitled "Integrated Emergency Medical Transportation Database System" is directed to computerized systems and methods for information management services in connection with emergency medical transport, which is often performed by helicopter. (PX 1).

2.  Providers of such emergency medical transportation must collect and track large amounts of data for the purposes of dispatching transport, treating patients (clinical services), and also for billing. (PX 1).

3.   The systems of the ′073 patent provide for the integration of dispatch, clinical services, and billing data.  (PX 1).

4.   The ′073 patent discloses a dispatch module, a clinical module, an administration module, and a billing module.  (PX 1).

5.   By integrating recordkeeping, these systems seek to avoid redundancy in the same.  (PX 1).

6.   The final sentence of the "Background of the Invention" section of the ′073 patent summarizes a basic concept of the invention: "what is needed is a comprehensive system that includes modules for dispatching emergency medical teams, tracking their movement to and from the accident scene, managing a clinical diagnosis and treatment and accurately billing the patient for the services rendered."  (PX 1, ′073 patent col.1 l.66-col.2 l.3).

7.   Claims 1, 6-8, 10, and 12-14 are apparatus claims; claims 15-22 are method claims.  (PX 1).

8.   Claims 1, 10, and 15 are independent claims.  (PX 1).

9.   Claim 1 requires integrating dispatch and billing data.  It provides:

> 1. A computerized integrated data management system for tracking a patient incident, comprising:
>
> a first module capable of dispatching an emergency transport crew specific to a patient incident requiring emergency medical care by the emergency transport crew, wherein transportation tracking information relating to the dispatch is recorded; and
>
> a second module capable of receiving information from the first module and billing the patient appropriately for costs indicative of the patient incident, including transportation costs.
>
> (PX 1, col.20 l.61-col.21 l.4).

10. Claim 15 requires integrating dispatch and clinical services data.  It provides:

> 15. A computerized method of generating a patient encounter record, comprising the steps of:
>
> collecting flight information relating to an emergency transport crew dispatch;
>
> collecting patient information from a clinical encounter associated with a patient incident requiring emergency medical care by the emergency transport crew; and
>
> integrating the patient information with the flight information to produce an encounter record indicative of the patient's clinical encounter.
>
> (PX 1, col.21 l.54-col.22 l.6).

3

11. In July of 1997, Dr. Kevin Hutton ("Dr. Hutton") engaged the Knobbe Martens Olson & Bear LLP law firm ("Knobbe Martens") to assist in the prosecution of the patent application that led to the '073 patent.  (5/11/12 IC Trans. 121:20-23).

12. The application leading to the '073 patent was filed on March 2, 1998.  (PX 1).

13. Dr. Hutton and Dr. Scott Jones ("Dr. Jones") were the named inventors.  (PX 1).

14. Michael Fuller ("Fuller"), a senior patent agent, and John M. Carson ("Carson"), a partner who supervised his work, prepared, filed, and prosecuted the patent application with the knowledge and assistance of Dr. Hutton and Dr. Jones.  (5/11/12 IC Trans.  37:9-18; 129:17-130:6).

15. At the time of the filing of the application, Dr. Hutton informed his patent attorneys that Air Medical Software ("the *AeroMed Software System*") was the system most similar to the subject matter of the application.  (5/11/12 IC Trans. 130:22-131:4).

16. The "Description of the Related Technology" section of the '073 patent specification discusses the *AeroMed Software System*.  The specification provides:

> Current documentation procedures in the air medical transport industry are based on an inefficient paper and pencil technology....
>
> ....
>
> The fragmentation throughout the medical transport environment is also evident in the myriad of entities throughout the country practicing different standards of care and documentation....  This is especially evident when certain aspects of the system (such as computerized clinical laboratory result displays) have been upgraded with a uniquely tailored computerized system, while the remaining functions are still performed in an archaic manner.  While the upgraded system may be effective for one singular aspect, such as dispatching, lab reporting, or chart dictating, the remainder of the system does not improve its effectiveness due to the other archaic components.
>
> Although others have attempted to remedy this conflict, no fully integrated medical systems have been developed.  For example, the Air Medical Software (Innovative Engineering of Lebanon, N.H.) provides computer software for dispatching emergency crews to accident scenes and managing flight information.  However, it does not provide comprehensive integration of the flight information with a clinical diagnosis, billing system and administration system.
>
> (PX 1, col.1 ll.11-57).

4

17. On August, 4, 1998, during prosecution of the ′073 patent, Fuller submitted an Information Disclosure Statement ("the IDS") further describing the *AeroMed Software System*.  (PX 3, 5/11/12 IC Trans. 65:12-20).

18. In the IDS, Fuller stated: "Applicants are aware of AeroMed Software, computer software for Air Medical Dispatch, Flight Program Management, Medical Charting, Continuing Education Tracking, Transfer Center, Physician's Referral Lines, and Custom Applications. AeroMed Software is a product of Innovative Engineering of Lebanon, New Hampshire." (PX 3, pp. 100-101).

19. The patent application included 27 claims.  (PX 3, pp. 68-70).

20. All claims were allowed and the ′073 patent issued on September 12, 2000.  (PX 1, 3, pp. 122, 124).

### B.  The Re-Examination of The ′073 Patent

21. After this Court's original decision on inequitable conduct, on May 7, 2009, a third party sought reexamination of the '073 Patent based on the materials produced in this litigation relating to the *AeroMed Software System*, including the user manual known as the Flight Management Module version 2.2.  (PX 206, pgs. 263- 292).[1]

22. On June 10, 2009, the PTO ordered reexamination of the '073 patent, and as part of its review, the PTO considered the entire litigation file of this case as shown below:

| LITIGATION REVIEW ☒ | JAK (examiner initials) | 6/4/2009 (date) |
|---|---|---|
| Case Name | | Director Initials |
| Golden Hour Data Systems, Inc. v. Health Services Integration, Inc. 3:06cv7477; U.S. Dist. Ct. CA Northern; open | | AK /tu 6/1 |
| Golden Hour Data Systems, Inc. v. Emscharts, Inc. et al. 2:06cv381; U.S. Dist. Ct. TX Eastern; closed . | | |

(PX 206, pg. 192).

---

[1] This Court takes judicial notice under Federal Rule of Evidence 201 of the proceedings held before the United States Patent Office for Serial Number 90/010,531, which was the reexamination of the '073 Patent.

23. On November 2, 2009, Golden Hour submitted the prior art included in emsCharts' preliminary invalidity contention including comprehensive operation manuals for the *AeroMed Software System* called the Flight Management Module version 2.2 ("FMM") and Dispatch Module version 2.2 ("DM"). (PX 206, pgs. 156-162).

24. In addition to the FMM and DM that the described the *AeroMed Software System* in detail, the *AeroMed Brochure* was also before the PTO during the '073 reexamination. First, the entire litigation file of this case was cited to the PTO, and the PTO confirmed that it had reviewed the entire litigation file. (PX 206, pg. 192) The litigation file included the inequitable conduct order that had reproduced within it a complete copy of the *AeroMed Brochure*. *See* Dkt. No. 284 (Inequitable Conduct Order); *Golden Hour Data Systems, Inc. v. emsCharts, Inc., et al.*, No. 2:06 CV 381, 2009 WL 781334 (E.D. Tex. Mar. 23, 2009) (same); *Golden Hour Data Systems, Inc. v. emsCharts, Inc.,* 91 USPQ2d 1556, 1560-1561 (the official publication of the Order in the United States Patent Quarterly) (same), each of which included a complete copy of the entire *AeroMed Brochure* as shown below:



### YOU WANT_

Computer programs designed specifically for **YOU**, the communicator, flight crew member, or chief flight nurse. A fast, easy way to create flight plans, cost quotes, track aircraft. No-nonsense medical charting. Billing. Followup letters. Statistics. Time analysis. CQI. Marketing. All of those paperwork headaches... **gone!**

You want **AeroMed Software**. Join over eighty programs worldwide who enjoy the ease of use, speed, and completeness of **AMS**.

No one else can offer you the range of products created just for the Air Medical industry. No one else can offer you ten years of experience solving your needs.

Interested? Read on...



Innovative Engineering
29 Morse Road
Lebanon, NH 03766

(603) 448-6824 Voice
(603) 448-6746 FAX/BBS
(800) 484-7087/1943 Sales

Computer Software for:

Air Medical Dispatch
Flight Program Management
Medical Charting
Continuing Education Tracking

Transfer Centers
Physician's Referral Lines
Custom Applications



GOLDEN HOUR V.
EMSCHARTS ET. AL.

EMS DX 482

C.A. No. 2:06-CV-381 (TJW)

GHDS081134

## DISPATCH Module

The AMS Dispatch Module can be used with the Flight Management Module or as a stand-alone system. It is an integrated real-time flight dispatching program used to log incoming requests, find coordinates of landmarks such as hospitals, road intersections, airports, towns, etc., produce flight plans, and dispatch the aircraft. It is extensively menu and hotkey driven and is FAST - the aircraft can be dispatched as quickly as the information is gathered.

### DISPATCH ADVANTAGES

 Calculates navigation for entire flight plan; displays nearest aircraft to scene. Can use the Yeoman plotter as a waypoint input device. Database of all US Towns, Airports, and Navaids is included.

 Pop-up windows display navigation information, radio frequencies, LZ descriptions, etc.

Up to 995 vehicles tracked simultaneously; unlimited pending request queue.

Real-time flight tracking. Hotkeys show nearest trauma center, airport, etc. Graphical flight path display. Yeoman Plotter can display position fixes.

 Automatically activates alphanumeric pagers.

## FLIGHT MANAGEMENT Module

The Flight Management Module is a companion to the Dispatch Module. All information entered by the Dispatch Module is combined into Flight Management so that duplicate data entry is eliminated.

The entire in-flight medical record is stored in the database for each flight.

Entering a flight sheet into the Flight Management Module is as easy as pointing and clicking on the item choices. Vital Signs can be downloaded directly from Propaq and Escort monitors. Help lines and data validation help users to enter correct data.

Billing becomes a breeze with the user-definable reports. Patient charges can be calculated and printed any number of ways to include transport time and itemizing of medical supplies.

Medical justification forms can be generated automatically, either single printouts per patient or as a batch at the end of the month.

AMS maintains information on hospitals, physicians, and EMS agencies, so your time spent on marketing and follow-up letters is reduced. With the mail merge system, producing them becomes effortless.

 Quality assurance reports are another key feature of the program. Data entry is audited for completeness and user ab ilities are printed to prompt crew members to enter missing data. QA summaries and tables allow a quick visual check for compliance. User-defined queries allow you to get the answers you need.

Statistics: Reports are a breeze with AMS. Some of the reports include:

AAMS Data Summary
Flight Requests by Type and Disposition
Time and Mileage Summary
Source, Destination, and Weather
Hour of Day, Day of Week, Duration
Medical Category and Diagnosis
Medical Category by Referring Agency
Referring and Receiving Agencies
Referring and Receiving Physicians
Flight Crew Activity
Procedures performed by Crew
Monthly Charges Summary
Non-Chargeable Flights
Pilot and Aircraft Logs
Daily Logs. Sorted as desired
Personal Flight Logs
FLORIDA STATE HRS Report

### ContinuED Module

Integrates with Flight Management. Keeps track of seminars and courses attended by your staff, and prints out biennial reports to satisfy National Registry of EMTs requirements. Keeps tabs on expiring certifications. Logs skills performed by staff while not flying. Helps you to plan your continuing education needs and keep everyone current.

GHDS081135

### Figure 2 (inside of brochure)

25. The file-history of the '073 patent reexamination individually cites the Inequitable Conduct Order (Dkt. No. 284) that had reproduced within it a complete copy of the *AeroMed Brochure*.  (PX 206, pgs. 44, 49, 52, 60-69 (Inequitable Conduct Order), 97-120, 604-29). Accordingly, the Court finds that the PTO reviewed the *AeroMed Brochure* during the '073 reexamination.  (5/11/12 IC Trans. 182:4-184:22).

26. With the primary source documents of the FMM and DM of record and with notice of this Court's previous rulings incorporating the entire *AeroMed Brochure*, the PTO issued a first

office action on February 22, 2010 rejecting all of the '073 patent claims based on the FMM, the testimony of Mr. Charles Freeman, and other cited art.  (PX 206, pgs. 140-148).

27. On March 29, 2010, Golden Hour responded arguing that the FMM:  (1) was not a prior publication; (2) did not enable the claimed invention; and (3) did not disclose or suggest all the elements of the claims.  (PX 206, pgs. 95-125).

28. On June 8, 2010, the PTO agreed with Golden Hour and affirmed the validity of all the '073 Patent claims in light of the FMM and DM, holding:

> First, the examiner agrees that the burden of proof has not been met by Requester regarding the availability of the Flight Management Module version 2.2 (henceforth FMM) as prior art.  Specifically, after the examiner read the complete deposition of Charles Freeman, there is no evidence that the document was in the public domain.  Mr. Freeman could not definitively state when the FMM was provided to the clients and took great pains to prevent its reproduction by others. As noted in the deposition and pointed out by Patent Owner on page 10 of the response, Mr. Freeman states only that it 'would' have been distributed which indicates that he had no specific recollection of its actual distribution.  Also, he tried to prevent others other than client from viewing the materials and discussed on pages 12-13 of Requester's response.  The remaining testimony provided in the deposition provides no additional insight as to FMM's actual distribution.  Further, there is no evidence that the document was ever copyrighted as indicated by Mr. Freeman.  Mr. Freeman is not a disinterested third party and clearly seeks to prevent his work from being duplicated.  This position is supported, by the deposition and the 'copyright notice' on page i-2 of the FMM.  Given the evidence provided by Requester and the arguments submitted by Patent Owner, the examiner cannot agree at this time that FMM was available as prior art; and therefore, as all of the rejections proposed by Requester are based on FMM, the rejections are withdrawn and the claims are confirmed over the prior art cited for use in rejections by Requester.

> Further, the examiner concurs that FMM is non-enabling.  The declaration by Mr. Hutton (with the accompanying court ruling) has been considered and found persuasive along with the arguments set forth by Patent Owner found on pages 14-19 of Requester's response incorporated herein by reference.

> Finally with regard to the various rejection based arguments, and specifically with respect to the independent claims, the following Requester's points have been found persuasive.  With regard to claim 1, the examiner concurs that while it is called a dispatching module, a separate program, not discussed in FMM handles the dispatching as noted on page 2-1 (see also Requester's argument in section (1) on page 21 of Requester's response, incorporated herein by reference).  Therefore, as it is unknown what actually dispatches the crew (i.e. a person, other program, etc), the claimed limitation is not met.  With regard to independent claim 10, it is

agreed that FMM does not teach the limitation of determining a diagnosis as required by the claim.  The passages cited by Requester, upon further review, only appear to give menus to help the user diagnose the problem and does not actually diagnose the issue based on input.

For the above reasons, claims 1-27 are confirmed as all of the rejections made by the examiner/Requester proposed rejections have been overcome.

(PX 206, pgs. 7-8).

29. The PTO was persuaded on all of these bases independently, finding that the *AeroMed Software System* as described by all the information gained through this litigation (and submitted in support of emsCharts' inequitable conduct claim) failed to anticipate all the elements of any of the claims of the '073 patent.  (PX 206, pgs. 7-9).

30. The *AeroMed Software System*, as described in the 178-page FMM, the 150-page DM, and the two-page *AeroMed Brochure*, is not but-for material to the claims of the '073 patent even if those references were considered publicly-available prior art publications.  (PX 206, pgs. 7-9).

### C.  The '073 Patent Claims Would Have Been Allowed Over The *AeroMed Website*

31. emsCharts also suggested the *AeroMed Website,* which purportedly captured by the archives of the online Wayback Machine in February, 1998, may serve as other possible evidence of prior on sale or public use of the *AeroMed Software System*.  (5/11/12 IC Trans. 134:4-135:15; DX1024, pgs. 087-091, 421-422).

32. The information regarding the features of the *AeroMed Software System* shown on the website pages purportedly archived by the Wayback Machine is substantively no different than the information in the *AeroMed Brochure*, which did not anticipate all the elements of any of the claims of the '073 patent in the reexamination.  (5/11/12 IC Trans. 197:9-198:1; 212:7-15; *Compare*, DX482, DX1024, pgs. 087-091, 421-422; *See also*, PX 206, pgs.7-9).

33. If the PTO had been provided with the *AeroMed Brochure* during the original prosecution of the '073 patent application, and if this had led the examiner to discover the *AeroMed Website* as purportedly shown in the archives of the Wayback Machine, there is no basis to conclude that the outcome would have been different than in the '073 reexamination, where all the

claims were found to be not anticipated by the *AeroMed Software System* as described in the FMM, DM, and the *AeroMed Brochure* that is substantively identical to the *AeroMed Website*.

34. In the '073 Reexamination, the PTO found the '073 claims patentable over the *AeroMed Brochure* and the *AeroMed Software System* even when it was disclosed in the detailed non-public FMM and DM user manuals and supported by Freeman's testimony.  (PX 206, pgs. 7-9)

35. The *AeroMed Brochure* is a secondary source of information that promotes the primary source, namely the FMM and DM. (11/21/2008 PM Jury Trial Trans. 58:4-25; 88:23-89:20; 90:14-16; 99:1-113:22).

36. In the '073 Reexamination, the PTO found the '073 claims patentable over the *AeroMed Brochure* and the *AeroMed Software System* because, among other reasons, even the detailed non-public user manuals did not enable the software.  (PX 206, pgs.7-9)

37. In the '073 Reexamination the PTO found the '073 claims patentable over the *AeroMed Brochure* and the *AeroMed Software System* because, among other reasons, even the detailed non-public user manuals did not disclose a system that included all the elements of any of the '073 claims.  (PX 206, pgs. 7-9)

38. If during the original examination of the '073 patent, the PTO had been provided only the then-publicly available documents and information regarding the *AeroMed Software System*, the PTO would have had even less information regarding the software than it had during the '073 Reexamination.  (PX 206, pgs. 7-9 (finding that the user manuals were not publicly available.))

39. Since the PTO found the '073 claims patentable over the *AeroMed Brochure* and the *AeroMed Software System* when provided with more information and detailed documents than were publicly available during the original prosecution of the '073 patent, it is reasonable to conclude that the PTO would have found the '073 claims patentable over the *AeroMed Brochure* and the *AeroMed Software System* when provided with only the very

limited information that was publicly available during the original prosecution of the '073 patent. (PX 206, pgs. 7-9).

40. emsCharts has not shown by clear and convincing evidence that the *AeroMed Software System* would have been but-for material to the claims of the '073 patent, i.e., that the claims of the '073 patent would not have been allowed if the examiner had been provided with all the publicly-available documents and information regarding the *AeroMed Brochure* during the original prosecution of the '073 patent.

### D. Applicants Accurately Stated Their Understanding Of The *AeroMed Software System* To The PTO In Good Faith As Supported By Credible Testimony And Evidence

41. There is insufficient evidence to show that either Dr. Hutton or Dr. Jones or their lawyers that prosecuted the '073 patent had ever seen any version of the *AeroMed Software System*, or had any firsthand knowledge of the functions or capabilities of any version of the *AeroMed Software System*, prior to issuance of the '073 patent. (5/11/12 IC Trans. 76:13-77:3; 82:22-83:24).

42. emsCharts never alleged that Golden Hour knew of or possessed either the FMM or DM user manuals during the original prosecution of the '073 Patent.

43. Dr. Hutton was aware since around the 1991 or 1992 timeframe that *AeroMed Software System* was being used by emergency transport providers in the United States. (5/11/12 IC Trans. 129:4-8).

44. In December 1996, Dr. Hutton wrote that the *AeroMed Software System* owners, Innovative Engineering, charged users $10,000 for the *AeroMed Software System*. (5/11/12 IC Trans. 131:5-9).

45. In December 1996, Dr. Hutton wrote that the *AeroMed Software System* included two modules: dispatch and clinical documentation. (5/11/12 IC Trans. 131:5-12).

46. In December 1996 Dr. Hutton wrote that updates to the *AeroMed Software System* were not provided over the Internet, but by a bulletin board service. (5/11/12 IC Trans. 132:21-133:1).

47. The Internet archive "Wayback Machine" has indicated that the *AeroMed Software System* had published a web page stating that AeroMed discontinued their bulletin board service in 1999, after the '073 patent application was filed.  (5/11/12 IC Trans. 134:4-136:4).

48. Dr. Hutton understood that the *AeroMed Software System* was in use by others in the United States when the '073 patent application was filed in March of 1998.  (5/11/12 IC Trans. 129:12-16).

49. At the time of the filing of the '073 patent application, Dr. Hutton informed his patent attorneys that the *AeroMed Software System* of Innovative Engineering of Lebanon, New Hampshire was, to his knowledge, the only similar information management product in the market.  (5/11/12 IC Trans. 130:22-131:4).

50. At the time of the filing of the '073 patent application, Dr. Hutton's understanding of the *AeroMed Software System* was secondhand, based on the statements of third party users.  (5/11/12 IC Trans. 137:19-138:6).

51. In 1997, Dr. Hutton understood that the *AeroMed Software System* had a text-based clinical software module, but that it was not commercially functional, such that most users preferred to use handwritten records and abstraction to perform data analysis and billing manually by hand.  (5/11/12 IC Trans. 146:25-149:1).

52. Prior to issuance of the '073 patent, and continuing through the May 11, 2012 hearing in this case, Dr. Hutton did not know what integration the *AeroMed Software System* had.  (5/11/12 IC Trans. 138:20-139:3).   Dr. Hutton believed it had some integration, but that it did not integrate truly with a clinical system.  (5/11/12 IC Trans. 138:20-139:15).

53. Prior to issuance of the '073 patent, Dr. Hutton's understanding of the *AeroMed Software System* is that it did not have integrated billing capacity.  (5/11/12 IC Trans. 139:16-146:24).

54. Dr. Hutton conveyed his understanding of the *AeroMed Software System* to his patent prosecution lawyers before the '073 patent issued.  (5/11/12 IC Trans. 130:22-131:4; 138:20-24).

55. There is insufficient evidence that either Dr. Hutton or Dr. Jones or their lawyers that prosecuted the '073 patent have ever seen any version of the *AeroMed Software System*, or have any firsthand knowledge of the functions or capabilities of any version of the *AeroMed Software System*. (5/11/12 IC Trans. 76:13-77:3; 82:22-83:24).

### E. Applicants' Treatment Of The *AeroMed Brochure* Was In Good Faith As Supported By Credible Testimony And Evidence

56. The *AeroMed Brochure* is an undated marketing brochure that advertised features of some version of the *AeroMed Software System*. (DX 482)

57. Dr. Hutton did not have the *AeroMed Brochure* at the time that the '073 patent application was filed on March 2, 1998. Dr. Hutton first obtained the *AeroMed Brochure* about three weeks later, at the 1998 Air Medical Transport Midyear Conference. (5/11/12 IC Trans. 124:22-127:6).

58. Dr. Hutton provided the *AeroMed Brochure* to his patent prosecution counsel sometime before August 4, 1998. (5/11/12 IC Trans. 65:12-66:18; 69:1-69:24; 79:12-20; DX2, pgs. 70-71).

59. The inside of the *AeroMed Brochure* described an unidentified version of the *AeroMed Software System* that had a dispatch module "that is a integrated real-time flight dispatching program" combined with medical charting and claimed "Billing becomes a breeze with the user definable reports." (DX 482).

60. The *AeroMed Brochure* stated that "[t]he AMS Dispatch Module can be used with the Flight Management Module...." (DX 482).

61. The *AeroMed Brochure* advertised "[a] fast, easy way to create flight plans, cost quotes, track aircraft. No-nonsense medical charting. Billing." (DX 482).

62. The *AeroMed Brochure* stated that "[t]he Flight Management Module is a companion to the Dispatch Module. All information entered by the Dispatch Module is combined into Flight Management so that duplicate data entry is eliminated." (DX 482).

63. Having received the *AeroMed Brochure* after the '073 patent application was filed, prosecution counsel prepared an Information Disclosure Statement ("the IDS") and filed it on August 4, 1998.  (5/11/12 IC Trans. 65:12-66:18; 69:1-69:24; DX 2, pgs. 70-71).

64. In the IDS prosecution, counsel copied the information on the front of the *AeroMed Brochure* and submitted that to the PTO instead of the Brochure itself.  (5/11/12 IC Trans. 92:6-93:23; 118:7-119:10).

65. Prosecution counsel had made it his practice not to submit undated documents.  (5/11/12 IC Trans. 56:4-57:12).

66. Prosecution counsel did not read the entire *AeroMed Brochure* but merely glanced through it for a date. (5/11/12 IC Trans. 99:13-21).

67. Prosecution counsel believed that the idea of the IDS was to identify to the Examiner that the applicant was aware of the identified software, so that the examiner could search for corresponding prior art versions of the software, if any.  (5/11/12 IC Trans. 92:6-94:22).

68. Prosecution counsel chose to copy only the front of the brochure because he assumed that the features listed on the front of the *AeroMed Brochure* were the things that AeroMed likely believed were the most important features of their software.  (5/11/12 IC Trans. 92:6-94:22).

69. The description of the *AeroMed Software System* in the IDS is identical with what is set forth on the front cover of the *AeroMed Brochure* (with the exception of the word "Centers" being plural in the brochure).  (DX 2, pgs. 70-71).

70. The IDS did not disclose the reference to "billing" described inside the brochure.  (DX 2, pgs. 70-71).

71. At no time during the original prosecution of the '073 patent application was the *AeroMed Brochure* itself, or its reference to "billing," provided to the examiner.  (DX 2).

72. Prosecution counsel provided a plausible explanation establishing why he did not submit a copy of the actual *AeroMed Brochure* to the PTO.

73. When prosecution counsel generated the '073 patent application, he was a patent agent who had been employed with Knobbe Martens for seven years and was in his last semester of law school at the University of San Diego School of Law.  (5/11/12 IC Trans. 117:11-23).

74. During the original prosecution of the '073 patent application, Golden Hour was a small and new client for Knobbe Martens, which was then an approximately 300-attorney IP firm. (5/11/12 IC Trans. 95:25-96:6; 109:10-110:4).

75. Prosecution counsel had insufficient motivation to intentionally deceive the patent office during prosecution of the '073 patent.  (5/11/12 IC Trans. 109:10-110:17).

76. Prosecution counsel provided credible testimony that they did not intentionally deceive the patent office during prosecution of the '073 patent.  (5/11/12 IC Trans. 109:10-110:17).

77. Dr. Hutton believes that the *AeroMed Brochure* does not contradict the statement in the specification that the *AeroMed Software System* "does not provide comprehensive integration of the flight information with a clinical diagnosis, billing system and administration system[,]" (PX 1, col.1 ll.54-57), because, among other reasons, Dr. Hutton reads the *AeroMed Brochure* as indicating that that version of the *AeroMed Software System* did not include a billing system.  (5/11/12 IC Trans. 167:15-169:9).

78. Dr. Hutton reads the *AeroMed Brochure* as indicating that that version of the *AeroMed Software System* did not include a billing system because the *AeroMed Brochure* references tracking time, and medical billing is not based on time.  (5/11/12 IC Trans. 167:15-168:3).

79. Dr. Hutton reads the *AeroMed Brochure* as indicating that that version of the *AeroMed Software System* did not include a billing system because the reports listed in the *AeroMed Brochure* did not include a charge sheet or any other type of output that would be necessary to be able to bill.  (5/11/12 IC Trans. 167:15-168:9).

80. Dr. Hutton reads the *AeroMed Brochure* as indicating that that version of the *AeroMed Software System* did not include a billing system because Dr. Ira Blumen, an early used of the *AeroMed Software System*, had told Dr. Hutton that the owner and programmer of the

*AeroMed Software System* – Mr. Freeman – did not know anything about billing, and that he had never heard that AeroMed had a billing system.  (5/11/12 IC Trans. 168:17-23).

81. Dr. Hutton provided credible testimony that he did not intentionally deceive the patent office during prosecution of the '073 patent.

82. The record does not contain clear and convincing evidence that the applicants or their prosecution counsel intentionally failed to disclose information known to them to be but-for material to the PTO in connection with the prosecution of the '073 patent.

83. The record does not contain clear and convincing evidence that the applicants or their prosecution counsel submitted false information to the PTO with the specific intention to deceive the PTO in connection with the prosecution of the '073 patent.

84. emsCharts has not proven by clear and convincing evidence that the applicants or their prosecution counsel intentionally failed to disclose information known to them to be but-for material to the PTO in connection with the prosecution of the '073 patent.

85. emsCharts has not proven by clear and convincing evidence that the applicants or their prosecution counsel submitted false information to the PTO with the specific intention to deceive the PTO in connection with the prosecution of the '073 patent.

## III.    CONCLUSIONS OF LAW

### A.  Jurisdiction

1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2.  This action arises under the Patent Laws of the United States, 35 U.S.C. § 1, et seq.

3.  emsCharts' counterclaims arise under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Patent Laws of the United States, 35 U.S.C. § 1, et seq.

4.  Because this action arises under the Patent Laws, the Court must apply the precedents of the United States Court of Appeals for the Federal Circuit, which has jurisdiction over any appeal of this judgment.  28 U.S.C. § 1295(a).

5. The question of inequitable conduct can be severed for trial by the court. *Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1371–75 (Fed. Cir. 2006). Here, the Federal Circuit directed this Court to conduct further factual findings on emsCharts' allegations of inequitable conduct. *Golden Hour Data Sys., Inc. v. emsCharts, Inc.*, 614 F.3d 1367, 1379 (Fed. Cir. 2010), *reh'ng and reh'ng en banc denied* (Nov. 24, 2010.) Subsequently the Federal Circuit decided *Therasense*, requiring this Court to completely revisit the inequitable conduct issue in this case. Dkt No. 313.

> **B. Applicable Standard Post-*Therasense*: A Finding Of Inequitable Conduct Requires A Showing By Clear And Convincing Evidence That Both The Withheld Reference Is "But For" Material, And Separately, That The "Applicant Knew Of The Reference, Knew It Was Material, And Made A Deliberate Decision To Withhold It."**

6. A finding of inequitable conduct may result if a patent applicant breaches the duty to prosecute a patent application in good faith and with candor. *See* 37 C.F.R. § 1.56; *Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1128 (Fed. Cir. 2006). *See generally*, *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287-92 (Fed. Cir. 2011) (*en banc*).

7. After *Therasense,* "[t]o prove inequitable conduct, the accused infringer must provide evidence that the applicant (1) misrepresented or omitted [but-for] material information, and (2) did so with specific intent to deceive the PTO." *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1334 (Fed. Cir. 2011) (citing *Therasense*, 649 F.3d at 1287).

8. The accused infringer must prove both but-for materiality and intent by clear and convincing evidence. *Therasense*, 649 F.3d at 1287; *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1229 (Fed. Cir. 2007) (quoting *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007)).

9. Clear and convincing evidence is that "weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder

to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *In re Medrano*, 956 F. 2d 101, 102 (5th Cir. 1992) (internal quotations omitted) *quoting Cruzan by Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 110 S.Ct. 2841, 2855 n. 11, 111 L.Ed.2d 224 (1990); *Matter of Jaques*, 972 F.Supp. 1070, 1079 (E.D.Tex.,1997).

10. As to proving materiality, "as a general matter, the materiality required to establish inequitable conduct is but-for materiality." *Therasense*, 649 F.3d at 1291. Stated another way, the court must determine "whether the PTO would have allowed the claim if it had been aware of the undisclosed reference." *Id.* In making this determination, the court must give claims their broadest reasonable construction. *Id.*

11. There is an exception to but-for materiality in the case where there is egregious affirmative misconduct. *Therasense*, 649 F.3d at 1292.

> This exception to the general rule requiring but-for proof incorporates elements of the early unclean hands cases before the Supreme Court, which dealt with "deliberately planned and carefully executed scheme[s]" to defraud the PTO and the courts. *Hazel–Atlas* [*Glass Co. v. Hartford–Empire Co.*], 322 U.S. [238,] 245, 64 S.Ct. 997, 88 L.Ed. 1250 [(1944)]. When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an *unmistakably* false affidavit, the misconduct is material. *See Rohm & Haas Co. v. Crystal Chem. Co.*, 722 F.2d 1556, 1571 (Fed. Cir. 1983) ("there is no room to argue that submission of false affidavits is not material"); *see also Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1996) (finding the intentional omission of declarant's employment with inventor's company rendered the affidavit false and that "[a]ffidavits are inherently material"). After all, a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that the falsehood will affect issuance of the patent. *See* [*Hazel–Atlas*, 322 U.S.] at 247 (pointing out that *patentee's lawyers "went to considerable trouble and expense" to manufacture false evidence* because they believed it was needed to obtain issuance of the patent).

> *Id.* (emphasis added).

12. An "egregious conduct" finding, however, is reserved for extreme behavior. The "egregious conduct" exception applies in the case where the evidence reveals "deliberately planned and carefully executed scheme[s]" to defraud the PTO and the courts. *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,* 322 U.S. 238, 245 (1944), *overruled on other grounds by Standard*

*Oil Co. v. United States,* 429 U.S. 17 (1976).  The cases cited by *Therasense* as examples of "egregious conduct" all involved affirmatively fraudulent conduct such as perjury, bribery and the manufacturing of false documentation.  *Hazel–Atlas,* 322 U.S. at 245 (manufacturing evidence by drafting fake scholarly article in order to trick and defraud the PTO); *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 809-10 (1945) (purposely false preliminary statement in PTO proceedings, followed by perjurious testimony)*; Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 243, 246–47 (1933) (patentee bribed prior user to sign false affidavit, which patentee then filed with the PTO).

13. Thus, to prove inequitable conduct, emsCharts bears the burden of proving by clear and convincing evidence that one or more people substantively involved with the application that led to the '073 patent (and the prosecution of that application before the PTO) both:  (1) had the specific intent to deceive the PTO; and (2) misrepresented or omitted but-for material information.  *Therasense*, 649 F.3d at 1287.

14. If emsCharts satisfies its burden of proving deceptive intent and materiality, this Court must balance the equities to determine whether the patentee's conduct before the PTO warrants rendering the entire patent unenforceable.  *Therasense*, 649 F.3d at 1287.

15.  "Intent and materiality are separate requirements." *Am. Calcar*, 651 F.3d at 1334.  The Court cannot "use a 'sliding scale,' where a weak showing of intent may be found sufficient based on a strong showing of materiality, or vice versa."  *Therasense*, 649 F.3d at 1290.  "A district court may not infer intent solely from materiality."  *Id.*

16. The Court must "weigh the evidence of intent to deceive independent of its analysis of materiality."  *Therasense*, 649 F.3d at 1290.

17. A presumption exists that the PTO examiners did their job and may be viewed as a presumption of administrative correctness.  *Brooktree Corp. v. Advanced Mico Devices, Inc.*, 977 F.2d 1555, 1574 (Fed. Cir. 1992).

18. To prevail, emsCharts "must prove that the applicant acted with the specific intent to deceive the PTO." *Therasense*, 649 F.3d 1290.  In a case involving nondisclosure of information, clear and convincing evidence must show "that the applicant knew of the reference, knew it was material, and made a deliberate decision to withhold it." *Id*. at 1289.

19. "Because the party alleging inequitable conduct bears the burden of proof, the patentee need not offer any good faith explanation unless the accused infringer first . . . prove[s] a threshold level of intent to deceive by clear and convincing evidence.  The absence of a good faith explanation for withholding a material reference does not, by itself, prove intent to deceive." *Therasense*, 649 F.3d at 1291 (internal citations omitted).

20. The specific intent to deceive must "be the single most reasonable inference to be drawn from the evidence to meet the clear and convincing standard.'" *Am. Calcar*, 651 F.3d at 1334.

21. The evidence "must be sufficient to *require* a finding of deceitful intent in light of all the circumstances." *Therasense*, 649 F.3d at 1290 (emphasis in original).

22.  "When there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290-91.

23.  "A finding that the misrepresentation or omission amounts to gross negligence or negligence under a 'should have known' standard does not satisfy" the intent requirement.  *See, e.g.,* *Therasense*, 649 F.3d at 1290.

24. "Proving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive." *Therasense*, 649 F.3d at 1290.

    **C.  Withholding The *AeroMed Brochure* Does Not Justify A Finding Of Inequitable Conduct Under *Therasense***

25. The *AeroMed Brochure* was cumulative to the AeroMed user manuals, the FMM and DM, which the PTO ruled were not but-for material in the '073 Reexamination.

26. Since the *AeroMed Brochure* was cumulative to the FMM and DM, and the PTO ruled that the FMM and DM were not but-for material to the '073 claims in the '073 Reexamination, emsCharts did not prove by clear and convincing evidence that the *AeroMed Brochure* would have been but-for material to the '073 claims.

    **a.   The AeroMed Brochure Was Not But-For Material**

        **i.   The *AeroMed Brochure*, And All The Other Documents Detailing The *AeroMed Software System* Admitted In This Litigation, Are Not Enabling**

27. The *AeroMed Brochure* was not but-for material, because it was not enabling and therefore could not anticipate the claims of the '073 patent.

28. The test for passing the enabling disclosure requirement under 35 U.S.C. § 112, first paragraph, is whether one reasonably skilled in the art could make or use the claimed invention from the disclosed subject matter together with information in the art without undue experimentation.  *United States v. Telectronics, Inc*., 857 F.2d 778, 785 (Fed. Cir. 1988).

29. The *AeroMed Software System* that is the subject of the *AeroMed Brochure* represents a significant body of programming effort that, under Federal Circuit standards, could not be enabled by a mere bullet-point brochure.  *See White Consolo*, 713 F.2d at 791 (no enablement where 1½ to 2 years required).

30. emsCharts cannot meet its burden to prove by clear and convincing evidence that the *AeroMed Brochure* is enabled.

31. Further, emsCharts has failed to provide adequate evidence of how a person of skill in the art would allegedly interpret the *AeroMed Brochure*.

32. emsCharts has failed to establish by clear and convincing evidence that that the '073 patent claims would not have been patentable but for the withholding of the *AeroMed Brochure*.

33. Since the *AeroMed Brochure* lacked enablement, it could not have stopped the PTO from granting the '073 Patent claims had it been disclosed.  Accordingly, under the appropriate

*Therasense* "but-for" test, the *AeroMed Brochure* is not material, and emsCharts' inequitable conduct defense fails.

34. For these same reasons, the *AeroMed Website* (which according to emsCharts is substantively identical to the *AeroMed Brochure*) is not material, and emsCharts' inequitable conduct defense fails there as well.

35. The only other documentary evidence of the *AeroMed Software System* submitted in this case was the FMM and DM.  The PTO has already found that those references were not enabling as they were applied to the '073 Patent claims. emsCharts has not provided this Court with clear and convincing evidence why this Court should set aside the PTO's finding on this issue.  Additionally, emsCharts did not meet its burden to prove otherwise by clear and convincing evidence, because it has failed to provide evidence of how a person of skill in the art would interpret the FMM and DM.  Therefore, the FMM and DM are not material, and emsCharts' inequitable conduct defense fails.

36. This Court concludes that the documentary evidence produced in this case that details the *AeroMed Software System* is not enabling.  This Court further concludes that emsCharts failed to meet its burden to prove otherwise by clear and convincing evidence, and that it failed to provide any independent or corroborated evidence of how a person of skill in the art would interpret any of the documents describing the *AeroMed Software System*.  Therefore, under the appropriate *Therasense* "but-for" test, emsCharts' inequitable conduct defense fails.

### ii.  The *AeroMed Brochure* Was Not But-For Material Because It Was Undated And Obtained After The Patent Was Filed

37.  The *AeroMed Brochure* is an undated document obtained after the patent application was filed.  Without more, the patent office could not consider it as prior art.  *See* 37 CFR § 1.98(b)(5) ("Each publication listed in an information disclosure statement must be identified by publisher, author (if any), title, relevant pages of the publication, date, and place of publication.").

22

38. The patent office rule book, the "MPEP," instructs examiners not to consider submitted references that do not comply with 37 C.F.R. § 1.98. *See* MPEP § 609.

39. Accordingly, if a patent examiner is provided with an undated non-patent publication, they should strike it from the record and not consider it, as happened in *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 868 fn. 5 (Fed. Cir. 2004).

40. The patent attorney that prosecuted the '073 application made it his practice not to submit undated documents.  (5/11/12 IC Trans. 56:4-57:12).

41. While the *AeroMed Brochure* could have been a material reference for other purposes under the old Rule 56, it could not have itself been a but-for material reference under the new *Therasense* rule, because it could not form the basis of a priority rejection if it was not prior art.

42. For example, if the *AeroMed Brochure* stated that a certain software module was available, and if this was inconsistent with statements in the '073 application that said no such software module was available, then this could not form the basis of a rejection because the undated *AeroMed Brochure* could be referring to things that came into existence after the priority date of the '073 application.

43. If the patent examiner in the original '073 application had been provided with the undated *AeroMed Brochure*, it is more likely than not that the examiner would have followed section 609 of the MPEP and acted as in the *C.R. Bard* case and simply struck it from the record without considering it.

### iii.   Even If The *AeroMed Brochure* Could Have Led To The *AeroMed Website*, The '073 Claims Would Have Still Been Patentable

44. The *AeroMed Brochure* was not but-for material, because even if applicants had provided it to the PTO during prosecution of the '073 patent, the evidence indicates that at most the examiner might have discovered a web page that contained the same information about the *AeroMed Software System* as the *AeroMed Brochure*, which itself was not enabling and

failed to anticipate all the elements of any of the claims of the '073 patent as precisely demonstrated in the '073 reexamination.

### b.  The Evidence Does Not Require A Finding Of Deceitful Intent

45. Even if the *AeroMed Brochure* would have been but-for material, emsCharts did not prove by clear and convincing evidence:   (1) that the applicants of the '073 patent or their prosecution counsel knew that the *AeroMed Brochure* was but-for material; and (2) that they made a deliberate decision to withhold it from the PTO with the specific intent to deceive the PTO.   In view of the plausible good faith explanations provided by applicants and their patent prosecution counsel, a specific intent to deceive is not "the single most reasonable inference to be drawn from the evidence.'"  *Am. Calcar*, 651 F.3d at 1334.   Nor is the evidence "sufficient to *require* a finding of deceitful intent in light of all the circumstances." *Therasense*, 649 F.3d at 1290 (emphasis in original).

### i.   The Characterizations of The *AeroMed Software System* In The '073 Specification Were Consistent With Applicant's Understanding

46. Dr. Hutton believed the *AeroMed Software System* did not have integrated billing capacity as that term would have been understood by a person of skill in the art in the context of the '073 specification.

### D.  No Egregious Misconduct

47. There is no duty on a patent applicant to search the prior art or seek out anything not already in the applicant's possession.  *Tafas v. Doll*, 559 F.3d 1345, 1373-1374 (Fed. Cir. 2009). Accordingly, there was no bad faith or "egregious" conduct here due to the applicant's not seeking out further information regarding the *AeroMed Software System*, and if the applicant had provided the examiner with the *AeroMed Brochure*, the examiner would have had to research it on his or her own.  *Id.*  The Court concludes, that consistent with *Tafas*, the PTO did not and could not seek further information from Applicant regarding the *AeroMed Software System* that was not already in Applicant's possession.   This conclusion is

consistent with Applicant's counsel's testimony that in over 20 years of practice, no PTO examiner has ever asked him to conduct prior art research for the PTO.

48. Further, the representations in the '073 Patent specification and those made in the August 1998 IDS regarding the *AeroMed Software System* were consistent with the understanding Golden Hour had at the time of those representations. Therefore, these representation cannot amount to "egregious" misconduct.

49. Based on the Court's review of the underlying factual circumstances in this case, it concludes there was insufficient evidence of "willful blindness" on the part of Golden Hour or its prosecution counsel.

50. Neither the applicants of the '073 patent nor their prosecution counsel engaged in affirmative acts of "egregious" misconduct because their actions have reasonable good faith explanations.

51. Even if all of emsCharts' inequitable conduct allegations were true, emsCharts would still not have proven that the applicants of the '073 patent or their prosecution counsel engaged in affirmative acts of "egregious" misconduct as that term has been construed in the case law.

### E. No Inequitable Conduct

52. emsCharts did not prove by clear and convincing evidence that the applicants of the '073 patent or their prosecution counsel misrepresented or omitted but-for material information during the prosecution of the '073 patent with the specific intent to deceive the PTO.

53. emsCharts did not prove by clear and convincing evidence that the applicants of the '073 patent or their prosecution counsel submitted materially false information to the PTO during the prosecution of the '073 patent with the specific intent to deceive the PTO.

54. The applicants of the '073 patent and their prosecution counsel did not engage in inequitable conduct during the prosecution of the '073 patent.

## IV. CONCLUSION

For the reasons set forth above, the Court finds emsCharts has not demonstrated by clear and convincing evidence that the applicants of the '073 patent or their prosecution counsel

engaged in inequitable conduct during the prosecution of the ′073 patent.  Accordingly, the ′073 patent is not rendered unenforceable on this ground, and judgment shall be entered in favor of Golden Hour, and against emsCharts on the issue of inequitable conduct.

**So ORDERED and SIGNED this 15th day of August, 2012.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE